John L. LEWIS and Josephine Roche, As Trustees of the United Mine Workers of America Welfare and Retirement Fund, Henry G. Schmidt, Trustee,

v.

James M. PENNINGTON, Ralph E. Phillips and Burce Phillips, Individually and t/a Phillips Brothers Coal Company, a partnership, .and Lillian Goad Phillips

v.

UNITED MINE WORKERS OF AMERICA.

Harry P. STANSBERRY, Individually and t/a Stansberry Coal Company,

v.

UNITED MINE WORKERS OF AMERICA.

Jesse C. FESLER and Nola Fesler, Individually and trading as Fesler Coal Company,

v.

UNITED MINE WORKERS OF AMERICA.

U. R. ARNOLD and Mrs. U. R. Arnold, Individually and trading as Arnold Strip Mining Company, a partnership, the Arnold Coal Company, Inc.

v.

UNITED MINE WORKERS OF AMERICA.

TENNCO, INCORPORATED,

v.

UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District 19.

W. R. PARTON, Individually and t/a W. R. Parton Coal Company,

v.

UNITED MINE WORKERS OF AMERICA.

E. C. McPHERSON, Individually and t/a E. C. McPherson Coal Company, M. W. Norquest and E. C. McPherson, Individually and t/a McPherson Coal Company,

v.

UNITED MINE WORKERS OF AMERICA.

WHITE OAK COAL COMPANY, Inc.

v.

UNITED MINE WORKERS OF AMERICA.

DEAN COAL COMPANY, a corporation,

v.

UNITED MINE WORKERS OF AMERICA.

W. R. PARTON, d/b/a W. R. Parton Coal Company,

v.

UNITED MINE WORKERS OF AMERICA.

Civ. A. Nos. 3431–3433, 3446, 3493, 3579, 3591, 4385, 4463, 4988.

United States District Court
E. D. Tennessee, N. D.

July 15, 1966.

John A. Rowntree, Fowler, Rowntree & Fowler, Robert S. Young, Jr., Knoxville, Tenn., for small coal operators.

E. H. Rayson, Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., Harrison Combs, Willard P. Owens, Washington, D. C., for United Mine Workers of America.

Val Mitch, Harold H. Bacon, Charles L. Widman, Washington, D. C., for trustees.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

These cases are the last chapter in a spate of litigation between coal operators in Scott, Anderson and Campbell Counties, Tennessee, and United Mine Workers of America (hereinafter sometimes referred to as UMW or the Union) resulting from labor disputes that arose in 1955 and continued intermittently through 1959.

Case No. 3431 was tried by a jury and a verdict and judgment rendered in favor of the coal operator. The judgment was affirmed by the Court of Appeals. Pennington v. UMW, Lewis, et al., Trustees, 325 F.2d 804 (C.A.6). The Supreme Court granted certiorari and reversed the judgment of the Court of Appeals holding as error the instruction of this Court to the jury that the approach of the Union and operators to the Secretary of Labor and TVA officials for the purpose of having a wage determination by the Secretary of Labor under the Walsh-Healey Act so as to prohibit governmental purchases of coal mined by miners paying wages under the minimum fixed by the Secretary of Labor, was legal unless made pursuant to a conspiracy to put the small coal operators out of business. It also held that the trial court erred in not telling the jury to exclude any damages which the operators may have suffered as a result of the Secretary's Walsh-Healey determination. United Mine Workers of America v. Pennington, 381 U.S. 657, 670, 671, 85 S.Ct. 1585, 14 L.Ed.2d 626.

By agreement, these cases were consolidated for trial and by agreement were tried without a jury. More than 4400 pages of testimony was introduced with 219 exhibits in a trial that lasted approximately four weeks.

In the suits brought by Lewis, Roche and Schmidt, as Trustees of the United Mine Workers of America, Welfare and Retirement Fund, in another phase of Cases No. 3431, 3432, 3433, 3446, 3493, 3579, 3591 and 4385, the Trustees sued for amounts alleged to be due pursuant to the terms of the trust provisions contained in the National Bituminous Coal Wage Agreement of 1950, as amended, for royalties due from each of the defendants in those cases on the respective tonnage of coal mined by each under the Collective Bargaining Agreement. Those suits were defended on the theory that the Bituminous Coal Wage Agreement of 1950, as amended, was an instrument used in a conspiracy which violated the antitrust laws and that the contracts violated the National Labor Relations Act, as amended.

It was held by the Court of Appeals in the case of Lewis v. Pennington, 6 Cir., 325 F.2d 804, cert. den. Pennington et al. v. Lewis et al., Trustees, 381 U.S. 949, 85 S.Ct. 1796, 14 L.Ed.2d 723, that regardless of the factual contentions of the defendants under these defenses, the Trustees were entitled to recover the royalties contracted for which were based on the tonnage mined by the defendants during the period of time involved. Judgment for the Trustees has been entered in that case.

The defendants in the other cases insisted that the *Pennington* decision was erroneous. But they argued even if they were wrong in that insistence, still the enforcement of the provision for royalties, which was forced on them pursuant to an illegal agreement or conspiracy caused them damage. And they insist they are entitled to recover, as an item of damage, the royalties paid, in addition to other damages arising from the alleged conspiracy in the cross-claims or actions against UMW.

In Case No. 4385, White Oak Coal Company, Inc. v. United Mine Workers of America, White Oak made additional defenses, but this case was disposed of and is no longer before the Court for consideration.

Case No. 3579, W. R. Parton, Individually and t/a W. R. Parton Coal Company v. United Mine Workers of America, has likewise been disposed of.

In Cases No. 3431, 3432, 3433, 3446, 3493, 3579, 3591 and 4385, the defendants filed cross-claims against the Trus-

tees based upon the alleged participation by the Trustees in the alleged conspiracy in violation of the antitrust laws. A voluntary dismissal without prejudice of the suits against the Trustees was entered in each of these cases.

In Cases No. 3431, 3432, 3433, 3446, 3493 and 3591, the defendants filed cross-claims against the UMW. In the case of Lewis et al. v. Parton, No. 3579, by order entered prior to the order consolidating these cases for trial, the cross-claim of the defendant Parton against UMW was assigned a new docket number, namely, No. 4988, and the order recited that the cross-claim was to be considered an original complaint against the Union.

The case of Dean Coal Company v. United Mine Workers of America, No. 4463, constituted an original action against the UMW.

The claims against UMW in all of these cases are based on an alleged conspiracy in which it is charged that UMW participated with major coal operators to drive small coal operators, including each of the parties to this suit (hereinafter sometimes referred to as plaintiffs or operators), out of business, in violation of Sections 1 and 2 of the Sherman Act.

Damages are sought against UMW in each of these cases.

## THEORIES UPON WHICH CROSS-PLAINTIFFS AND PLAINTIFFS EXPECT TO RECOVER AGAINST UMW AS SET FORTH IN THE PRE-TRIAL ORDER

Plaintiffs (and it will be understood this term includes all cross-plaintiffs) contend that UMW engaged in a conspiracy, agreement or understanding with the major coal companies in the United States and their representatives, particularly Bituminous Coal Operators Association (hereinafter called BCOA), Consolidation Coal Company, Peabody Coal Company, West Kentucky Coal Company, Nashville Coal Company, Island Creek Coal Company, Pittston Company and Pittsburgh-Midway Coal Company, and others, to stabilize the prices of coal, to restrain the trade of small coal producers and to monopolize the bituminous coal industry for the major coal producers.

### Background of the Alleged Conspiracy

After World War II, the economics of the bituminous coal industry became unstable on account of more coal being produced than the markets required; that before 1950, the major coal producers and the Union were in agreement that the major problem of the industry was over-production and that the growth of small, independent and non-union producers was contributing to the problem; that the major companies and the Union disagreed on how the problem should be handled in the period right after World War II; that on its side the Union was contending that the answer was to cut down on the working time of all producers; that the Union urged a three-day work week and for many months before the 1950 contract was signed, the Union took the initiative on this question and directed the working time of the men in the industry, its officials setting on some weeks, three-day work weeks, and other times a no day work week; that the major coal companies were opposed to the Union's dictating the working time of the men in the industry because it cut into their profits; that both the Union and major coal companies were concerned with the prospects of a repetition of the depressed conditions in the industry that occurred in the 1920's after the "Jacksonville scale" period, which was precipitated by companies in the South that refused to recognize the UMW contract; that in 1949, in the course of the bargaining sessions over the contract that became the National Bituminous Coal Wage Agreement of 1950, major coal producers were discussing among themselves how to accomplish the stabilization of the industry and the establishment of an organization to deal with the UMW so that agreements could be worked out that would be binding upon the entire industry and to accomplish the settlement of national problems in the industry on an authoritative basis that

would govern all coal producers, thereby eliminating the chances, or greatly reducing the prospects, of some producers escaping the uniform terms of a national union contract and precipitating conditions comparable to those of the 1920's.

### Formation of the Alleged Conspiracy

After the signing of the 1950 National Bituminous Coal Wage Agreement, the major producers who had engaged in the discussions referred to above commencing in 1949, formed the Bituminous Coal Operators Association in 1950 and a marked change was noted in the relations between the Union and the major coal companies as disclosed in the bargaining relations before and after 1950; that the express understanding at the time of the signing of the 1950 Bituminous Coal Wage Agreement was that the major coal companies themselves were to decide on the working time for their employees; that this was a surrender on the part of the Union of its previous policy of seeking to control the working time, and of its efforts to give more equitable working opportunities for its members throughout the industry; that the understanding between the Union and the Bituminous Coal Operators Association was that the problem of stabilizing the economics of the industry, the problem recognized by both the Union and the major coal companies, was to be taken care of by establishing national contract amendments that would be applied to all bargaining units throughout the industry and these agreements were to be tailored to the abilities of the major coal companies without regard to the abilities of the smaller companies or the companies working in marginal seam areas, in spite of the fact that there were great divergencies in the geological conditions in the various fields of coal mining and a great disparity in the means and methods of production, leaving great numbers of companies that would be unable to operate under the contract and leaving their share of the markets to the major coal companies who could successfully operate under the contract as it was amended.

### Use of the National Bituminous Coal Wage Agreement in the Alleged Conspiracy

The conspiracy as alleged involved the use of the National Bituminous Coal Wage Agreement and its successive amendments as an instrument in accomplishing the purposes of the conspiracy; that by successive amendments to the Uniform National Bituminous Coal Wage Agreement's terms, the wage scale and the Welfare Fund payments per ton were raised to exceedingly high levels; that the mechanization program of the major coal companies was to go ahead rapidly and the successive increases in wage scale and Welfare Fund payments were designed and tailored to meet the abilities of the major coal companies to mechanize and not have their profits affected by the increasing labor costs in the successive amendments; that these amendments to the labor contract were made after careful consideration of the abilities of the major coal companies to make the increases without affecting their profits; that the Union knew that many weaker companies could not pay the increases, but had no concern as to whether they could pay; that the Union favored the taking over of the industry by the large combines of coal producers and that the Union worked toward this end; that the campaign to impose the wage contracts upon the smaller, independent and non-union mines was intense after 1950 and paralleled the formation of the International Organizing Committee by the Union; that in areas of strong resistance mobs and terrorism were used; that the Trustees of the Welfare Fund stood by and benefited, as pensioners under the Welfare Fund were organized into bands which had as their purpose the imposition of the uniform contract upon the smaller and non-union companies; that benefits under the Fund were held out to the men in the industry as being under Union control so as to regain their fading allegiance to the Union as unemployment spread; that the finances of the Union and the finances of major coal companies have been used

to further the drive to bring all production under the contract; that one or more major coal companies have assisted in crushing the opposition of the principal union competitor of United Mine Workers in the bituminous coal labor fields; that the result of this conspiracy and of these activities has been that large numbers of small companies have been driven out of the industry and that thousands of men in the industry have been driven into unemployment; that when these men are put out of the industry, they cease to participate in Welfare Fund benefits and the Fund remains as a source of benefit only for the employees of those companies that survive.

To accelerate the demise of the smaller companies devices were inserted into later amendments of the National Bituminous Coal Wage Agreement which further restrained their trade; that companies which could not afford to pay the wage scale under the contract were barred from operating on the lands of signatories to the Agreement; this device which was inserted in the National Agreement was effective because the major companies have acquired great tracts of the coal lands of the country and there is little coal land left for the small companies to operate upon under conditions which would make it possible to abide by the Agreement; that in the Protective Wage Clause of 1958, the small companies were prohibited from selling coal to the signatories to the Agreement, including the major companies which supplied coal to the large markets under long-term contracts, when they could not abide by the terms of the Agreement.

### Protective Wage Clause in the Amendment of 1958

In 1958 the bituminous coal industry felt a recession and decreasing demand for coal so that the price of coal in the markets was to some degree affected; that this induced United Mine Workers and Bituminous Coal Operators Association and the major companies to seek a strengthening and extension of the understandings which they had between themselves with respect to the duties of the Union and the duties of the major coal companies under the conspiracy; that in December of 1958 the National Agreement was again amended, principally by the insertion of the "Protective Wage Clause" under which the Union bound itself not to enter into, be a party to, or permit any other kind of labor contract in the industry except the National Agreement which it signed with Bituminous Coal Operators Association; the Union further bound itself to enforce fully the terms of the National Agreement with respect to all signatories; on the other hand, the Bituminous Coal Operators Association and the other major coal companies who successfully signed the National Agreement bound themselves to engage in the boycott of "sub-standard coal" or coal not mined under the terms of the National Agreement; that thereby the Union expressly put upon itself a strait jacket which required it to impose upon all operators in negotiations in which it represented bargaining units of employees, the same terms which it negotiated with Bituminous Coal Operators Association; thereafter the enforcement and policing of the National Agreement terms were intensified and the efforts to force the 1958 amendment upon the industry resulted in the destruction of many of the companies and the severe damaging of many of the other companies in the industry, including the coal companies in these cases.

### The TVA Market

That the development of the Tennessee Valley Authority as the principal purchaser of coal in the entire country caught the attention of the conspirators to the Southern Appalachian Region when TVA opened up many of its coal-using generating units in 1954, 1955 and 1956; that in 1955 the conspirators manifested their intent and purpose to take over the TVA market by working together to obtain a determination by the Secretary of Labor that the prevailing wage in the bituminous coal industry under the Walsh-Healey Act was the UMW contract scale that had been forced

onto the industry, as described above; that while such joint activity with respect to such determination by the Secretary of Labor was not itself a violation of the antitrust law, the purpose and character of other activities of the conspirators to use the UMW's scale as a competitive lever by forcing it upon competitors is manifested by these particular activities and statements made in connection therewith; because contracts for less than $10,000 were exempted from the prevailing wage determination under Walsh-Healey, small companies were able to ship coal on TVA spot orders; that the conspirators further showed their purpose and state of mind by setting about to eliminate or drastically reduce the spot market of TVA; in addition, the conspirators adopted the practice of bidding low prices to drive the TVA coal market price down to a price which a small producer could not meet at a profit; in this phase of the campaign the West Kentucky Coal Company and its subsidiary, Nashville Coal Company, took the most prominent part; the Union had over $25,000,000 of risk capital invested in these companies; that large tonnages were dumped upon the coal market of TVA by these companies at low prices; that the immediate competitors of West Kentucky Coal Company in the West Kentucky field followed the lead of the company in pricing in order to obtain TVA business and prices of the West Kentucky field fell to very low levels with the inevitable result that sales prices in the TVA coal market became depressed; that the TVA provided the principal market of the companies in these cases and the TVA prices were beaten down to such an extent that these companies suffered large losses trying to retain their position in that market and lost contracts by reason of the low pricing; that the conspiracy manifested itself in the field in East Tennessee by a squeeze applied to the local operators from the market side and the labor side; that while a price wall or ceiling was imposed upon them in its principal market, the Union, pursuant to agreement with Bituminous Coal Operators Association and other major producers, raised the labor costs on the local producers by forcing terms and labor contracts that were unreasonable in this field and by interferences with production; that the Union used force and violence, seeking to force the 1958 amendment upon this coal field, a practice which had been followed in previous years, and the Union refused to bargain with local producers with respect to the labor terms.

In the cases of *W. R. Parton*, No. 4988, and *Dean Coal Company*, No. 4463, the aforesaid violence employed by the Union is asserted as an additional basis for claims of violation of the state law and common law. However, it is expected that all damages sustained by these two plaintiffs will, as in the other cases, be shown to have resulted also from the aforementioned violation of the antitrust law; and only in the event of the failure of Parton and Dean Coal Company to recover damages arising from violence under the antitrust claim, will it be necessary for the Court to pass upon their common law or state law claims as such.

## THEORIES OF UNITED MINE WORKERS OF AMERICA AS SET FORTH, IN PART, IN THE PRE-TRIAL ORDER

UMW says that it has acted to further the best interest of its members through arms-length bargaining with representatives of coal operators within the framework of the Federal Labor Law throughout the pertinent period. Its objectives in negotiating and executing the various wage agreements have been to achieve a uniform living wage, decent and safe working conditions and various fringe benefits. It has made no agreement with any coal operator at any time to impose a wage agreement upon other operators. Its wage agreements have resulted from its own policies and not by agreement with any of the coal operators of one unit to seek the same wages or benefits from other operators.

From its origin as a labor union in 1890, UMW has endeavored to unite in

one organization all workers employed in and around coal mines, coal washeries, coal processing plants and coke ovens and has sought to obtain a uniform wage scale for all its members so employed.

### UMW Objectives and Policy

UMW strives for national equality of compensation for its members because it believes that miners should receive the same wage for his labor wherever he happens to work, regardless of the particular economic circumstances of an individual operator. Wage differential should not be the basis for affording to one operator a competitive advantage over another. Removal of differences in labor standards as an element of competition is at the core of UMW policy.

UMW does not subsidize marginal operators through substandard labor conditions.

UMW denies that it entered into any contract or joined in any combination or conspiracy in restraint of trade or commerce in violation of the Sherman Act and denies that it has monopolized or attempted to monopolize or that it combined or conspired with any other person or persons or group of persons to monopolize any part of the trade or commerce among the several states.

The 1950 agreement resulted from arms-length collective bargaining over a long period of time during which UMW was restricted in its bargaining efforts by federal court decrees and both UMW and coal operators were mandated to settle their disputes. The 1950 agreement was the only understanding between UMW and operators and was not an instrument of conspiracy.

Under District Court scrutiny, NLRB and Attorney General surveillance, with assistance of members of the Presidential Inquiry Board, and with UMW's bargaining abilities circumscribed by judicial restraints, UMW and operators, bargaining in good faith, achieved the 1950 Agreement, which, obedient to the February 11, 1950 injunction, created a union security clause to comply with Taft-Hartley, made Fund benefits available to signatories' employees regardless of UMW membership, and eliminated the "able and willing" clause and amended the "memorial period" clauses, which had been disputed issues in the bargaining negotiations.

UMW denies that the provisions of the 1950 Agreement and its amendments violated the Sherman Act.

In 1950, as in all proceedings and subsequent negotiations, UMW formulated its wage demands based upon its view of what the industry as an entirety could afford to pay and of what the miner needed to maintain and improve his standards of living, in conformity with UMW's policy of national uniformity of labor standards.

UMW denies that the successive increases in the wage scale and Welfare Fund payments were tailored to meet the abilities of the major coal companies to mechanize and thus not to have their profits affected by the increased labor costs in the amendments to the National Agreement after 1950. UMW has regarded mechanization to be an exclusive management prerogative in which it in no way participates. UMW has never opposed mechanization. Mechanization was a normal procedure long prior to 1950 and was not an issue in the 1940–1950 negotiations.

Prior to 1950 and since, there has been a direct relationship between wages and the expansion of mechanization in the coal industry. As output per miner increases through mechanization, UMW insisted through collective bargaining, that the higher productivity justified a higher wage rate.

Between June 30, 1949 and March 5, 1950, there was no collective bargaining agreement and thus no obligation for UMW members to produce any coal. During this period, UMW directed for some weeks a working period of three days a week in mines east of the Mississippi River, but the directive was not effective west of the River.

UMW neither sought nor wanted a contractual three-day work week and it was not a bargaining issue for inclusion

in the 1950 Agreement. The reasons for the directive of the three-day work week were (1) to abate the public concern as to any alleged possible shortage of coal, (2) as a bargaining tactic and (3) to spread available work among normal labor forces to enable each miner to have some income during negotiations.

Mine workers knew that bargaining negotiations would not terminate as long as miners worked full time during the bargaining process.

The 1950 Agreement did not turn over to the UMW responsibility for the administration of the UMW Welfare and Retirement Fund. Administration of this Fund was the joint responsibility of the employer and employee representatives, with tie-breaking authority vesting in a neutral as required by Section 302 (c) (5) of the National Management Relations Act of 1947.

The law required and the Agreement provides that all employees of signatory operators are eligible to participate in the Fund as beneficiaries.

Employees in the industry were not led to believe that the Fund was under UMW control. Fund Trustees exercised every reasonable means to inform signatory employees of their rights in the Fund.

Trustees of the Fund did not institute suit for delinquent royalties to eliminate small operators.

Major coal companies have not fostered UMW's domination in the industry. UMW's bargaining history has remained substantially the same since 1890.

As early as 1897, and since, UMW has bargained on a multi-employer basis in a geographic interstate area representing the largest production area in the industry, known as the central competitive field, which has changed from time to time as the volume of production shifted. The Agreement thus achieved by UMW representatives with operators' representatives in the particular central competitive field became the guide for negotiating contracts between UMW and operators in other districts.

In all negotiations, both prior to and after the 1950 Agreement's execution, UMW, in Convention and pursuant to its constitution, has constituted and authorized its Policy Committee to deal with negotiations between the meetings of its quadrennial Conventions, and bargaining agreements can be finalized only when authorized by the UMW Policy Committee.

Since 1947, the Taft-Hartley Act has mandated UMW to bargain collectively with representatives selected by the operators. In all negotiations, both prior to and after 1950, UMW negotiated with the authorized representatives of operators. In negotiations for the 1950 Agreement, UMW met and bargained separately with (1) representatives of the northern operators, (2) representatives of the southern operators, and (3) representatives of captive operators. Since 1950, it has bargained collectively with BCOA as the bargaining representative of the northern group of operators and captive mine owners producing the largest tonnage of coal in the competitive market for bituminous coal. The BCOA was in the process of being formed long prior to the 1950 Ageement's execution and was established as a labor relations agency to give to the largest group of coal operators a single voice in negotiating a collective bargaining agreement with UMW. Any agreement must have operator approval and the UMW Policy Committee's authorization. Southern coal producers have not been members of BCOA. Western operators have been in and out of BCOA. Generally, BCOA has been the first to sign. With the legal authority to demand that UMW bargain with it as Taft-Hartley mandates, southern producers have historically preferred to bargain as a separate unit and to negotiate a labor agreement after UMW has executed with other groups. Consonant with its basic policy of seeking a uniform agreement, the agreement first achieved by UMW has served as a guide for other groups.

UMW has not agreed with any operator or group of operators to impose upon other groups the agreement first executed.

Since 1941, UMW has sought to protect the integrity of the labor standards contained in UMW's collective bargaining agreement and thus preserve work opportunities for its employee members covered in the contract unit. A 1943 order of the National War Labor Board directed that each UMW contract include a provision relating to leased mines, that "Operators agree that they will not lease any operating mines subject to this Agreement as a subterfuge" to avoid the Agreement's provisions. This clause by reference was contained in the Ickes-Lewis Agreement in 1943 and in the National Bituminous Coal Wage Agreement of 1945. The 1952 Agreement provides that operators "agree that they will not lease out any coal lands as a subterfuge for the purpose of avoiding the application of this Agreement." It expresses a covenant which the basic agreement would in any event imply.

The subterfuge provisions proved inadequate. To root out circumvention, a "protective wage clause" (sometimes called PWC) was negotiated in 1958. UMW proposed it and the operators refused to accept it and offered counter-proposals which UMW rejected; and when agreement was reached, operators professed reluctant acceptance to avoid an interruption in the supply of coal. The clause was a continuation of UMW's efforts to prevent operators from vitiating the agreement signed by them by subleasing practices.

The clause's purpose had to do with substandard wages and conditions. In negotiating the 1958 Agreement, UMW complained that signatory operators were subleasing their coal lands to individuals and newly formed corporations and other business organizations controlled by themselves and using other, variant devices and schemes, all geared to obtaining coal produced under substandard labor conditions and thereby depriving their employees of work opportunities and labor standards required under the UMW

Agreement. These complaints brought counter-charges from some signatories that UMW field representatives were entering into agreements whereby other signatories were excused from paying wage scale or the royalty payments required by the UMW Agreement. Though UMW denied the counter-charges, operators insisted upon assurances from UMW.

Thus, two promises were made: First, as provided in PWC's paragraph A, UMW assured operators signatory to the Agreement that it would not, during the Agreement's term, enter into or permit any agreement covering labor standards applicable to employees covered by this contract on any basis other than those specified by the Agreement or applicable district agreement and that UMW would perform and enforce the paragraph's term "without discrimination or favor" and that it (UMW) "will use and exercise its continuing best efforts to obtain full compliance therewith by each of the parties signatory hereto," which provision it alleges emphasizes that such assurances did not run to those coal producers not yet signatory. UMW is free to negotiate a labor agreement at variance with the national agreement. Second, operators promised that if they obtained coal from others not mined by themselves, it would be obtained from operators who maintained labor standards "as favorable to the employees as those provided for in this contract," thus assuring UMW that acquisition of coal from others would not be used by a signatory operator as a device to undercut the labor standards to which it has promised to adhere. This second provision is known as the work standards clause. The clause does not prohibit dealings between any persons. Signatories must assure themselves that coal in which they deal has been produced under labor standards at least equal to those set forth in UMW's contract. A nonunion producer need only to see that coal is produced under standards equivalent to those in the Agreement if he wishes to sell coal to a signatory, and the clause does not impose either the

UMW or its agreement on a non-signatory. It does, however, protect the job opportunities of the unionized worker and safeguards his employment and his wage and benefit scale by removing the economic inducement to signatory producers to purchase coal under substandard conditions. PWC was never enforced. The PWC was executed on December 3, 1958. Its legality was not questioned under the NLRB at the time it was executed. However, on September 14, 1959, effective sixty days later, the National Labor Relations Act was amended by the addition of a section 8(e) which invalidated the so-called "hot cargo" agreement by which an employer, in the statutory language, "ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting, or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person. * * *" The purpose of Section 8(e) is to bar an agreement which sanctions a secondary boycott.

On August 27, 1963, the National Labor Relations Board found that the work standards provision of PWC violated Section 8(e). But on judicial review, the Court of Appeals for the District of Columbia Circuit on August 4, 1965, concluded that the Board applied incorrect legal principles in reaching its decision and remanded the case to the Board for redetermination in accordance with proper standards.

Meanwhile, the Board having invalidated the work standards clause, UMW negotiated a substitute for it, designated to meet the same problem to which the earlier clause had been directed. The substitute clause, known as the Welfare Fund clause, required a signatory operator to pay into the UMW Welfare and Retirement Fund the sum of 80 cents per ton for each ton of coal acquired by it on which the sum of 40 cents per ton had not previously been paid into the Fund.

The Welfare Fund clause requiring signatories to pay 80 cents on coal pro-cured or acquired from non-signatories is devoid of secondary pressures and does not fall within the targets at which 8(e) was aimed.

Though UMW had investments in stock ownership of West Kentucky Coal Company, and loans to other stockholders secured by shares of that company's common stock, it was not a Sherman violation to make such investments; such investments were made subsequent to the alleged conspiracy in 1950 when West Kentucky was not a UMW signatory; West Kentucky became such a signatory only upon evidence that its employees had, in writing, selected UMW as bargaining agent and its execution of the UMW agreement accorded with national labor policy. UMW made no suggestions and proposed no policies with reference to West Kentucky's management, marketing or pricing policies. West Kentucky bids on the TVA market were formulated by West Kentucky personnel without consultation or knowledge of UMW.

There was no collusion among businessmen to drive small operators from the market by predatory price-cutting or like anti-competitive business behavior. No individual coal company has a dominant share of the market. Dependable capacity to furnish the quality and quantity at a reasonable price governs the share of the market that any miner operator obtains. There are no sheltered markets for small or large operators.

The 1950 and successor Agreements, like all preceding agreements, are the product of UMW's independent judgment obtained by the independent efforts acting unilaterally and alone and in its own self-interest, free of any alliance or combination with any employer or employers for a predatory anti-competitive purpose.

UMW denies that it violated the laws of the State of Tennessee with respect either to Parton Coal Company or Dean Coal Company. It denies that any of the companies are entitled to damages.

*Issues*

The issues as formulated in the pretrial order are:

(1) Did the UMW engage in a combination or conspiracy, as alleged by the coal companies, so as to unreasonably restrain trade or to monopolize commerce among the several states, outside or beyond the exemption granted by the antitrust statutes to a labor organization?

(2) Did UMW violate any duty under Tennessee law to plaintiffs, Parton Coal Company and Dean Coal Company, and if so, was such violation or violations the proximate cause of the claimed damages sustained by them, or either of them?

(3) If the answer to the foregoing issues, or either of them, is in the affirmative, what damages, if any, resulted to the individual plaintiff coal companies by reason thereof?

### Guidelines Fixed by the Supreme Court in the Pennington Case

The guidelines for the decision of the antitrust phase of these cases are set forth by the majority opinion of the Supreme Court in the case of the United Mine Workers of America v. Pennington, et al, supra.

The Supreme Court held that under the circumstances of the case the Union is not exempt from liability under the antitrust laws and that the action of the District Court in overruling UMW's motion for a directed verdict and for judgment notwithstanding the verdict was proper. 381 U.S. p. 661, 85 S.Ct. 1585.

The Court observed that Section 20 of the Clayton Act, 38 Stat. 738, and Section 4 of the Norris-LaGuardia Act, 47 Stat. 70, permit a union, acting alone, to engage in the conduct therein specified without violating the Sherman Act, but that neither of these sections expressly deals "with arrangements or agreements between unions and employers. Neither section tells us whether any or all such arrangements or agreements are barred or permitted by the antitrust laws. Thus *Hutcheson* [U. S. v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788] itself stated: 'So long as a union acts in its self-interest *and does not combine with non-labor groups,* the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.'" p. 662, 85 S.Ct. p. 1589.

The Court pointed out that the Allen Bradley Company v. Local Union No. 3, etc., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, decision made explicit what had theretofore been merely a qualifying expression in *Hutcheson* and held that "when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts." It further pointed out that subsequent cases have applied the *Allen Bradley* doctrine to such combinations without regard to whether they found expression in a collective bargaining agreement, and even though the device for effectuating the purpose of the combination was an agreement on wages. 381 U.S. p. 662, 85 S.Ct. 1589.

The Court also pointed out that if the UMW in this case in order to protect its wage scale had presented a set of prices at which the mine operators would be required to sell their coal, the Union and the employers who happened to agree could not successfully defend this contract provision if it were challenged under the antitrust laws by the Government or by some party injured by the arrangement. In such a situation, said the Court, the restraint on the product market is direct and immediate, and is of the type characteristically deemed unreasonable under the Sherman Act and the Union gets from the promise nothing more concrete than a hope for better wages to come.

The Court further observed that if the Union became a party to a collusive bidding arrangement designed to drive Phillips and others from the TVA market, as

charged in the complaint, any claim to exemption from antitrust liability would be frivolous at best.

It was also observed that the major part of Phillips' case was the claim that the Union entered into a conspiracy with the large operators to impose the agreed-upon wage and royalty scales upon the smaller, non-union operators, irrespective of their ability to pay and regardless of whether or not the Union represented the employees of these companies, all for the further purpose of eliminating them from the industry, limiting production and pre-empting the market for the large unionized operators. p. 664, 85 S. Ct. 1585.

The Court then observed that wages lie at the heart of collective bargaining between employers and unions and the law contemplates agreements on wages not only between individual employers and a union, but agreements between the union and employers in a multi-employer bargaining unit. National Labor Relations Board v. Truck Drivers Local Union, etc., 353 U.S. 87, 94–96, 77 S.Ct. 643, 1 L.Ed.2d 676, 381 U.S. p. 664, 85 S.Ct. 1585 and that the union benefit from the wage scale is direct and complete and the effect on the product market results from the elimination of competition based on wages among the employers in the bargaining unit, which is not the kind of restraint Congress intended the Sherman Act to proscribe. Apex Hosiery Co. v. Leader, 310 U.S. 469, 503–504, 60 S.Ct. 982, 84 L.Ed. 1311; Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46 (C.A. 8), 381 U.S. p. 664, 85 S.Ct. 1585

The Court stated that a union may conclude a wage agreement with the multi-employer bargaining unit without violating the antitrust laws and it may as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek the same wages from other employers. p. 664, 85 S.Ct. 1590.

Negotiations between Union and employers are not automatically exempt from Sherman Act scrutiny simply be-cause the "negotiations involve a compulsory subject of bargaining, regardless of the form and content of the agreement." The Board's demarcation of the bounds of the duty to bargain has relevance to any consideration of the sweep of labor's antitrust immunity, for the Court is concerned with harmonizing the Sherman Act with the national policy expressed in the National Labor Relations Act or promoting "the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation." Fibreboard Paper Prods. Corp. v. National Labor Relations Board, 379 U S. 203, 211, 85 S.Ct. 398, 403, 13 L.Ed. 2d 233.

But there are limits to what a union or an employer may offer or extract in the name of wages and just because they must bargain does not mean that the agreement reached may disregard other laws. Local 24 of Internat'l Broth. of Teamsters, etc. v. Oliver, 358 U.S. 283, 296, 79 S.Ct. 297, 3 L.Ed.2d 312; United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 399–400, 67 S.Ct. 775, 91 L.Ed. 973.

The Court further observed that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the antitrust laws could be made out on evidence limited to such union behavior. Immediately following this statement, Justice White, in Footnote 2 of the opinion, stated:

"Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. *The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. Such union conduct is not alone sufficient evidence to maintain a union-em-*

*ployer conspiracy charge under the Sherman Act.* There must be additional direct or indirect evidence of the conspiracy. There was, of course, other evidence in this case, but we indicate no opinion as to its sufficiency." (Emphasis added.)

The Union it said forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the Union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry. 381 U.S. p. 666, 85 S.Ct. 1585.

The policy of antitrust law is clearly set against employer-union agreements seeking to prescribe labor standards outside the bargaining unit.

"From the viewpoint of antitrust policy, moreover, all such agreements between a group of employers and a union that the union will seek specified labor standards outside the bargaining unit suffer from a more basic defect, without regard to predatory intention or effect in the particular case. For the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy. * * *" p. 668, 85 S.Ct. p. 1592.

Mr. Justice Douglas interpreted Mr. Justice White's majority opinion by suggesting to the trial court how under the opinion it should charge the jury on the retrial.

First, if there were an industry-wide collective bargaining agreement whereby employers and the union agreed on a wage scale that exceeded the financial ability of some operators to pay and that if it was made for the purpose of forcing some employers out of business, the union as well as the employers who participated in the arrangement with the union should be found to have violated the antitrust laws.

Second, an industry-wide agreement containing those features is prima facie evidence of a violation. Justice Douglas added a footnote to this statement to the effect that acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act. In support of the principle contained in the footnote, he cited a number of cases, not one of which involved a union.[1]

It is to be observed that Mr. Justice Douglas under paragraph 1 stated that if the agreement contained the two factors mentioned in that paragraph, namely, an industry-wide agreement whereby employers and the union agreed on a wage scale that exceeded the financial ability of some operators to pay and that it was made for the purpose of forcing some employers out of business, both the employer and the union to the agreement would be guilty of violating the antitrust law. Yet, in the second sentence, he says that such industry-wide agreement containing those features is only prima facie evidence of a violation of the antitrust laws.

We believe that Justice Douglas meant that in order for an employer and a union to be guilty of violating the antitrust laws, the industry-wide agreement must exceed the financial ability of some operators to pay and it must be made for the purpose of putting some employers out of business.

1. Eastern States Retail Lumber Dealers' Assn. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; Lawlor v. Loewe, 235 U.S. 522, 534, 35 S.Ct. 170, 59 L.Ed. 341; American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035; Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610.

This presents a question upon which the attorneys are in disagreement. The attorneys for the operators insist that if the effect of the agreement is to force a certain number of operators out of business, regardless of the intent of the parties, the employer and the Union violated the Sherman Act. Attorneys for the Union maintain that the effect of the agreement of forcing some employers out of business is not sufficient to show an antitrust violation; that the other element of predatory intent must be present.

This question has given the Court much concern. The preponderance of the proof shows that the smaller eastern Tennessee operators, including plaintiffs, with the exception of plaintiff Tennco Corporation, could not pay the wages provided in the 1950 Agreement, as amended from time to time until 1964, including the 40 cents royalty on each ton of coal produced.

█ Upon careful consideration, the Court has reached the conclusion that the *Pennington* case teaches that it is necessary to find predatory intent to drive small coal operators out of business in order to hold the employer and Union for a violation of the Sherman Act.

Justice White's Footnote No. 2 indicates that the antitrust law is not designed to protect marginal operators; that ill effects alone on the marginal operators is not enough to show intent.

█ The standard of proof necessary to show predatory intent is governed by the recent decision of the Supreme Court in United Mine Workers of America v. Gibbs (C.A. 6, March 28, 1966), 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.

This case involved interpretation of Section 6 of the Norris-LaGuardia Act which states in effect that no association participating in a labor dispute shall be held liable for the unlawful acts of individual officers, members, etc., "except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

In the ordinary case, proof would be simply by a preponderance of the evidence and in the criminal case guilt would have to be established beyond a reasonable doubt. Under Section 6 of the Norris-LaGuardia Act, as interpreted by the Supreme Court in the *Gibbs* case, a middle ground is reached with respect to the quantum of proof necessary for civil liability.

Justice Brennan suggested that Congress meant "at least to signify meaning like that commonly accorded such similar phrases as 'clear, unequivocal and convincing proof' * * *. He is required to persuade by a substantial margin, to come forward with 'more than a bare preponderance of the evidence to prevail.' "

Justice Harlan, who was joined by Justice Clark, concurred in the decision, but felt that the statute was simply directed against a particular type of inferential proof of authorization or ratification unacceptable to those who framed the law. "For me [that is Harlan], the gist of the statute is that in the usual instance a union's carrying on of its normal strike functions and its failure to take affirmative action to dispel misconduct are not in themselves proof of authorization or ratification of the wrongdoing."

It seems apparent that the Court in the *Gibbs* case by interpretation of the statute, has placed a heavier burden of proof upon a plaintiff in this type of case.

*Position of Coal Companies with Respect to the Proof of Violation of Sherman Act*

The main proof relied upon by plaintiffs, if we interpret their position correctly, is the statement by Mr. Moses that one of the reasons for the establishment of BCOA was to avoid the possibilities of a recurrence of the effect to the Jacksonville scale in the 1920's when southern companies got out from under the UMW contract and engaged in price cutting. It is said that this showed a purpose upon the part of the strongest companies and the Union to get together and fix wages in a national contract so

as to avoid price competition; that Mr. Love made the statement in effect that BCOA and the Union had worked out a contract to stabilize prices in the industry and that that was a per se violation.

It is said that the Union prior to the formation of the BCOA was urging the operators to adopt some sort of protective plan to stop the dropping prices which was a matter of concern to the Union because of the history of the 1920's; that one of the reasons for the formation of the BCOA was to avoid price war of 1920's; that the meaning of Mr. Moses' statement was that the southern companies were going to be kept in line under the contract so that the 1920's situation would be avoided; that the spokesman for BCOA and the Union felt free to discuss these matters openly as being a reasonable proposition, but that the purposes to stabilize prices encroach upon an area of per se violation; that an effort to force uniform wages throughout the industry to avoid price competition does not eliminate wages as leverage in price competition; that the working conditions in the East Tennessee mines— thin seams of coal—rough terrain, methods of production, differences in working conditions, made a uniform wage for the miners who worked in this area a tremendous disadvantage to the Tennessee operators and a great advantage to the stronger operators; that the alleged boycott provision of the land-lease clause of the 1952 contract and the alleged boycott provision contained in paragraph B of the Protective Wage Clause of the 1958 contract were Sherman violations; that a similar protective wage clause was found in violation of the Sherman Act in United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 398–400, 67 S.Ct. 775, 91 L.Ed. 973.

The attacks of UMW on TVA for buying coal from the producers of the East Tennessee field and the investments of UMW in the West Kentucky Coal Company, the second largest producer selling coal to TVA, and the practices of that company, aided by finances from UMW, and working with other major producers in taking over markets, including ¾ths of the TVA market, constitute proof, plaintiffs alleged, of purposeful acts to drive the East Tennessee companies out of business.

### Oral Argument of Counsel for Plaintiffs

In oral argument, counsel for plaintiffs stated that there are many desperate men in the coal fields of Tennessee; that there has been a great deal of violence; that there is something wrong in the industry; that the names of the dead mines, plaintiffs' being on the list, have been listed in the trial; that the real question is whether this condition should be brought about by a small combination of men in large cities who sit down and make arrangements with respect to the destiny of these people. He contended that the first question for consideration is whether there was an arrangement or a combination or agreement with business men by the Union to fix wages that small operators could not pay. He argued that the evidence showed such an arrangement by the UMW and BCOA and that this combination worked for the establishment of national agreements for the years 1951, 1952, 1955, 1956, 1958 and 1964. Mr. Moses, one of the leading negotiators for BCOA, stated that the purpose of BCOA was to negotiate national agreements and to settle industry problems on an authoritative basis. That is what happened in the east Tennessee coal fields.

Mr. Love, who was the prime mover in setting up BCOA, stated that his purpose was to see that his competitors in the coal business paid the same wage as he paid regardless of the circumstances.

From these facts, it is argued that there was a clear understanding that the contract was to be applied nationally.

Counsel asserted that the effect of the combination or arrangement was to force small coal operators out of business and that the law supplied the specific intent to drive them out of business. In addition, he argued that there is clear proof

in the record of a purposeful understanding to eliminate the smaller companies from having any fair chance of survival. In support of this argument, he stated that when the BCOA emerged the Union ceased to be concerned for job opportunities for its members. Concern by the Union for the smaller companies was abandoned with the emergence of BCOA. There was a joint effort of BCOA and UMW to avoid, in the negotiations, large scale negotiations in which the interest of such small companies would be given expression and publicity. On the contrary, negotiations were taken out of the public view and conducted in secret conferences between a handful of negotiators—actually a two-man bargaining team. Harry Moses used the term "two-man bargaining team."

The stated purpose of the BCOA and the Union was to maintain a stabilization of production and prices so that a recurrence of the Jacksonville situation of the 1920's would be avoided. Moses stated that this was one of the reasons for the establishment of BCOA. Another reason for the formation of BCOA was to avoid the price war of the 1920's. The boycott provision and the land-lease provision in the 1952 contract are evidence of the purposes of the BCOA and the Union.

Counsel argued that these matters show a clear violation of the Sherman Act under the opinions of Mr. Justice White and of Mr. Justice Douglas.

### Oral Argument of Counsel for Defendant

Counsel for the defendant stated in oral argument that adversary counsel had repeatedly claimed and repeatedly attempted to prove that contemporaneously with the negotiations of the 1950 Bituminous Coal Wage Agreement, a side agreement was made, but that they have failed to prove it.

Counsel stated further that the Supreme Court commented that "a major part of Phillips' case, however, was that the union entered into a conspiracy with the large operators to impose the agreed-upon wage and royalty scales upon the smaller, nonunion operators, regardless of their ability to pay and regardless of whether or not the union represented the employees of these companies, all for the purpose of eliminating them from the industry, limiting production and preempting the market for the large, unionized operators."

That BCOA was the same group of operators that had been bargaining with the Union since 1924, namely, the Pennsylvania, Ohio, West Virginia, northern Virginia group of operators, the old competitive field. After the 1950 Agreement, the BCOA was formed in July, 1950. Fifty per cent or a little bit more than that of the national tonnage was represented by the BCOA. That tonnage was produced in Ohio, Pennsylvania, northern West Virginia, Tennessee, Virginia and Kentucky. Two hundred sixty-two individual companies composed the membership of BCOA, 130, or about half of them, were companies that mined less than 100,000 tons a year. The record indicates that a concern that mines less than 100,000 tons a year is a small operator. After the 1950 negotiations, UMW contracts represented about 77% or 78% of the coal produced.

That the Union operated through a policy committee which designated a subcommittee to negotiate with the BCOA. In June 1949, the southern group of operators terminated their contract pursuant to its terms. The northern operators did not terminate the contract. After the southern group had terminated its contract, the Union terminated the contract with the northern group.

Mr. Lewis, according to defendant, then suggested to the southern and northern groups that they work three days a week in order to provide the country with coal until they could reach a successor agreement. The operators refused. Mr. Lewis then instructed the miners to work the three days a week and that is all they worked. In the meantime, the negotiators had conferences at White Sulphur Springs and at Bluefield, West Virginia, that lasted through December. They couldn't agree. Both the southern and

northern coal operators walked out of the meeting. In December, the whole mining industry was down because the miners were not working. They did not have a contract. In 1950, the coal operators filed an unfair labor practice complaint. Public concern was voiced about the shortage of coal and the President appointed a fact-finding board and the Attorney General and the Labor Board obtained injunctions to compel the groups to get back together and bargain in good faith.

The Government, defendant argued, instituted contempt proceedings against the Union and its leaders. Before that the Union had been summoned into the federal court for contempt proceedings because the men were not working. It was under these conditions that the 1950 Agreement was reached. It would seem a bit unusual that the Union and the operators · who had been fighting each other for some fifteen years would enter into a conspiracy to violate the antitrust laws.

The Southern Coal Producers and the Southern Tennessee Coal Producers signed the 1950 Agreement. They also signed it in 1951 and 1952. The 1952 Agreement was disapproved by the Wage Stabilization Board and the Southern Coal Producers filed a petition with the Board for approval and the Southern Tennessee Coal Producers signed it. The 1958 Agreement was also signed by that association.

Counsel argued that the first indication of any charge of a conspiracy about the 1950 Agreement was when the plaintiffs were sued for the 1958 delinquent royalties. They filed the counterclaim raising this defense.

The policy committee of the Union designated a subcommittee to bargain with the operators and to negotiate a contract and to report back to the policy committee for its approval or disapproval. Mr. Love, negotiator for the BCOA, had to report back to the representatives of their 262 companies as to his success or lack of success in trying to work out a contract with the Union.

Messrs. Lewis, Kennedy and Owens represented the Union in the negotiations. Counsel argued that there was no evidence of a conspiracy.

### Mining Conditions in Tennessee

The production of coal in Tennessee during the World War II years ranged between 7,000,000 and 8,000,000 tons per year. From 1945 to 1948, the production was in the vicinity of 6,000,000 with a drop off in 1949 to slightly more than 4,-000,000.

With the growth of the TVA steam plants, and the increasing market offered by those plants, the first half of the 1950's showed increasing production until in 1956, the peak tonnage year, production reached 8,747,000 tons in Tennessee. There was then a rapid decline from 1957 through 1959. The production in 1959 fell to roughly 6,000,000 and that tonnage was maintained roughly in the period of 1960 through 1964.

Since the signing of the National Bituminous Coal Wage Agreement of 1950, there has been a tremendous increase in the number of small mines in classes 5 and 6 and also an increase in the percentage of the production for these classes, with a corresponding drop in the number and the production share of the middle-sized mines, classes 2, 3 and 4. This held true until 1960 and from that point through 1964 the numbers of these smaller mines have diminished without any substantial increase in the number of the middle-sized mines. There was no class 1 mine in Tennessee, that is, one producing as much as 500,000 tons of coal per year, except for one which showed up on the statistical record for the years 1942, 1943, 1956, 1962, 1963 and 1964. In the latter years this mine, the largest mine in the State, was operated by Consolidation Coal Company at Trimore, in Anderson County, Tennessee.

The middle-sized mines of the State employed relatively large numbers of men and as these mines passed out of existence in the late 1940's and early 1950's the men from these mines moved

over into the small mines that were being opened, thus giving employment to men who would otherwise be idle.

The Tennessee seams of coal average in thickness far less than the average in any other of the major producing states. In Tennessee only 32% of the coal is over four feet thick; in Pennsylvania, 55%, in West Virginia, 69%, in Ohio, 47%, in Kentucky, 65%, and in the country as a whole 64% of the coal comes from seams thicker than four feet.

The thickness of a coal seam has a great effect on the adaptability of that seam to mechanization and increased productivity, and the thinness of the Tennessee seams has resulted in difficulties and delay in mechanization. Tennessee is considerably behind the other major coal producing states in employing the most modern mechanization. In the Tennessee seams of coal it is impossible to mechanize to the degree possible in areas where the thicker seams of coal exist. In Tennessee, manpower rather than heavy machinery must be resorted to, to a far greater degree than in other major coal producing states.

### Development of the TVA Steam Plant Market

The increased use of electricity in homes, industry and on farms in the Tennessee Valley and the great expansion of the AEC facilities in the Valley created a great increase in the demand for electricity from TVA. The sale of power by TVA to AEC was a very modest part of the total sales of TVA in 1951, but by 1956 the sales to AEC were greater than the total of all other sales of electricity throughout the area served by TVA power. And by 1956 TVA was delivering to AEC more than twice as much steam-generated electricity as the entire system of TVA-Hydro Plants was able to produce.

The first Widows Creek steam-generating unit was in service on July 1, 1951; the first Kingston Plant unit, on February 8, 1954; and the first John Sevier unit, on July 12, 1955. The last of the original units at Widows Creek was in service on July 7, 1954. The last unit at John Sevier was in service on October 31, 1957. The last unit at Kingston was in service on December 2, 1955.

The construction program for the major steam plants of TVA began about 1948 and has been going on constantly up to the present date. However, the period of 1951–1961 was the period of fastest growth and it is not expected that the future growth will be comparable to this earlier period.

The growth and the generation of power by the steam plants of TVA was from two and one-half billion kilowatt hours in 1951 to forty-eight billion kilowatt hours in 1961.

The steam plant system of TVA (the major plants constructed by TVA) consists of the John Sevier Plant, in Upper East Tennessee; the Kingston Plant, near Kingston, Tennessee; the Widows Creek Plant in Alabama, just south of South Pittsburgh, Tennessee; the Colbert Plant in Alabama, situated in the Tri-Cities area; the Johnsonville Plant, near Johnsonville, Tennessee; the Shawnee Plant in Kentucky, near where the Tennessee River empties into the Ohio; the Gallatin Plant on the Cumberland River near Gallatin, Tennessee; and the Paradise Plant in Ohio County, western Kentucky.

TVA steam plants burn coal exclusively. TVA is the largest purchaser of coal in the country. TVA purchases one-tenth of all the coal sold to all of the nation's power systems.

The publication of TVA "Facts about TVA Steam Plants," published April 11, 1956, states that TVA expanded its coal purchases in less than five years "from about 1,000,000 tons a year to about 18,000,000 tons during the current year."

In 1953 TVA received 6,415,000 tons of coal and it burned 5,765,000 tons. In 1954, TVA received 10,196,000 tons of coal and burned 9,301,000. In 1955 TVA received 14,377,000 tons and burned 14,-210,000. In 1956 TVA received 20,354,-000 tons and burned 18,134,000. In

1957 TVA received 19,481,000 tons and burned 17,672,000. In 1958 TVA received 17,033,000 tons and burned 17,278,000. In 1959 TVA received 17,808,000 tons and burned 18,815,000 tons. In 1960 TVA received 18,886,000 tons and burned 19,035,000 tons.

With the development of the Steam Plant system, TVA made strenuous efforts to encourage coal operators to enlarge old mining facilities and to develop new mining facilities, and encouraged the operators in other areas to move into the TVA area to increase production. Many operators took advantage of the situation and developed and expanded mining facilities in the area.

In 1953, TVA received 2,262,000 tons from Tennessee, approximately 40% of the state's production; in 1954 TVA received 4,291,000 tons from Tennessee, 66.7% of the state's production; in 1955 TVA received 4,531,000 tons from Tennessee, 64.2% of the state's production. (It is to be seen that 1956 was the year the market fully developed.) In 1957 TVA received 5,664,000 tons from Tennessee, 71.2% of the state's production. In 1958, TVA received 4,763,000 tons from Tennessee, 70.2% of the state's production. In 1959 TVA received 4,311,000 tons from Tennessee, 72.9% of the state's production. In 1962, TVA received 4,-814,000 tons from Tennessee, 64.3% of the state's production.

Only rarely does TVA buy coal on a negotiated basis and that is only where there is an emergency situation in circumstances under which competitive bidding had not produced ample and timely supply. An emergency apparently occurred only once in major proportions and that was in the period 1955–56, when emergency purchases were made for the Kingston Plant in tonnages aggregating 500,000 tons, at the time when the Kingston Plant first became fully operative.

Outside of emergencies, TVA is required by statute to obtain its coal by advertising and sealed bids opened in public.

TVA analyzes the bids received and determines the bid with the lowest cost with respect to the amount of heat to be generated from the coal. The amount of heat is determined by the btu content of the coal. Also included in the computation of cost is the transportation cost. The quality of the coal is guaranteed by bidders. Thus, quality, the cost of transportation, together with the price of the coal, are the three elements the TVA uses in analyzing cost and this cost is analyzed on the basis of cost per million BTUS at the plant.

TVA buys coal on spot contracts and on term contracts. The greatest share of the coal is bought on term contracts. The amount of coal the TVA buys on the term market was originally established at 75% by TVA policy but by 1962 this amount had arisen to 88%. Generally, the invitations for bids for the term market specify that TVA will receive on a contract not less than 500 tons per week and not more than 10,000 tons per week for a period of not less than six months. The length of the term varies. Generally, TVA buys on term contracts of one to three years. However, TVA does issue from time to time invitations to bid in which the term is limited, not for three years, but four, five or ten years, or longer.

The balance of the TVA coal is purchased on spot bidding. The invitations for this bidding call for much smaller quantities and for delivery within a few weeks after the contract is executed. The invitations for the spot bids generally go out at the end of each month reflecting the amount of spot coal that the TVA expects to buy the succeeding month. The purchases are then made under the resulting bidding on a week to week basis.

The spot buying program is designed primarily to gear the receipt of coal more closely to actual needs. The coal burn at the various plants is not uniform throughout the year. It varies, depending upon the load that is supplied by each plant, and the load is determined by many factors, including the weather. The term contracting program is used to fill the primary supply; and then, in order to reduce the peaks and valleys of

burn and receipts of coal, the spot program is used to fill the gaps in the supply of term coal.

Whether or not a bid is submitted for delivery to a particular plant of TVA generally depends upon the method of transportation. In the case of rail deliveries the bidders generally offer the coal f. o. b. rail cars at origin and then TVA computes the applicable transportation cost to any plants where the coal might be competitive in determining the cost under the bid. In the case of truck deliveries, the bidder specifies a particular plant to which the coal is offered and the transportation cost is included in the bid price. In the case of large deliveries the bids include a price sometimes f. o. b. the origin and sometimes f. o. b. barge at the plant.

The TVA steam plant system was designed to draw, and is capable of drawing coal from ample deposits in several coal fields. Some of these fields lie in southern Illinois, Indiana and western Kentucky, this being part of the midwestern basin deposit. Another field is in Southern Appalachia, including the eastern part of Kentucky, southwest Virginia and upper east Tennessee, extending over into the Monterey area. Another field is in southeastern Tennessee and northern Alabama.

No field is situated so as to supply all of the TVA plants because of transportation distances involved under normal competitive situations. Generally, each plant can draw competitively from two or more areas. It was the intent and expectation of TVA to obtain coal from the fields nearest to the particular plant. The John Sevier Plant is normally supplied from southwestern Virginia; and from Middlesboro, Kentucky-Jellico, Tennessee, origins on the Southern railroad. The Kingston Plant is generally serviced from the Jellico-Middlesboro-Pineville field in east Kentucky and from the upper east Tennessee field. Since 1959 large shipments have been from the Hazard field in east Kentucky; also coal moves to Kingston from the southeastern Tennessee field to a limited extent and some coal has moved to the Kingston Plant from the west Kentucky field, generally in emergencies. One other field supplying Kingston is the Monterey field in Middle Tennessee. The Widows Creek plant is generally supplied from the southeastern field in Marion, Grundy and Sequatchie Counties, Tennessee, with some coal moving there from the Alabama Sand Mountain Plateau field; also coal moves to the Widows Creek plant from the western Kentucky mines by train and coal can move into Widows Creek by barge from the middle-western fields. The western Kentucky field supplies the coal to the Gallatin Plant. The Paradise Plant receives coal from mines adjacent to the plant in western Kentucky. The Shawnee and Johnsonville Plants are supplied from the middlewestern fields in Illinois, Indiana and western Kentucky. Plants capable of receiving coal by barge are Widows Creek, Colbert, Johnsonville, Shawnee and Kingston.

There is one other plant in the TVA system recently constructed which came into service only toward the end of this trial—the Bull Run Plant in east Tennessee, near Clinton. This plant has been designated as the destination for coal from the Hazard field in east Kentucky, under a fifteen year contract for 30,000 tons per week.

The TVA steam plants generally maintain a storage of coal in quantities sufficient to supply the requirements of the plant for 60 to 90 days.

As stated above, the bids specifying shipment by rail to the TVA steam plants do not generally specify a particular plant but are filed with the price fixed at the point of origin and the rail shipments make up the greatest bulk of the shipments to the TVA steam plant system. The TVA steam plants are connected with transmission lines and the entire system makes a large network supplying power to the whole TVA area. The TVA maintains in Chattanooga an IBM 704 electronic data processing machine or computer, which, on the basis of cost factors at the various plants, determines

the loading of the TVA power plants and comes up with the lowest total cost of generating power at any particular time. This machine determines at which plant the load should be increased and at which plant the load should be decreased.

Factors that go into the cost computation and the determination of the allocation of load between the plants include: The location of the demand and the loss by transmission, the economies or efficiency of the various steam plant generating units; the amount of water in the reservoirs of TVA lakes and the season of the year; and the cost of the coal used in the various plants. The cost of coal represents approximately one-half of the generating cost.

The TVA steam plant system was so designed as to be able to draw coal from several coal fields, as stated above, and be able to shift over the years the relative volume of coal obtained from the various fields.

The TVA officials made it clear in discussions with the coal suppliers in Tennessee, that the TVA steam plant system was part of an inter-connected power system in which the use of the various plants was determined by the relative economics of the plants and that if a plant became less economical to operate than others because of its relative coal costs, then this plant naturally would be operated less heavily than other plants that might be operated more cheaply because of cheaper sources of coal. The TVA officials explained to the operators in Tennessee that these determinations were made by feeding data into the electronic computer.

*UMW Investments in West Kentucky Coal Company, which was Strategically Located With Respect to the TVA Market*

By July 1, 1958, United Mine Workers had made the following investments in West Kentucky Coal Company and Nashville Coal Company: (Nashville Coal Company was purchased by West Kentucky Coal Company in 1955.)

### In Nashville Coal Company

| | |
|---|---:|
| 25,000 shares (Chertsey loan collateral) | $2,625,000.00 |
| 10,000 shares (Sagamore loan collateral) | 1,050,000.00 |
| 10,000 shares (Tower loan collateral) | 1,050,000.00 |
| Total | $4,725,000.00 |

### In West Kentucky Coal Company

| | |
|---|---:|
| 875,000 common shares owned | $ 2,354,522.04 |
| 50,000 preferred shares owned | 2,500,000.00 |
| Pledge of assets on bank loan | 5,200,000.00 |
| 90,600 shares (Cyrus Eaton Loan collateral) | 2,513,895.18 |
| 84,560 shares (Chertsey loan collateral) | 2,153,279.50 |
| 84,912 shares (Sagamore loan collateral) | 2,287,809.32 |
| 25,300 shares (Tower Loan collateral) | 443,223.90 |
| 5,200 shares (Tower Loan collateral) | 77,938.32 |
| 1,300 shares (Tower Loan collateral) | 18,847.04 |
| 8,128 shares (Tower Loan collateral) | 176,461.07 |
| 20,000 shares (Tower Loan collateral) | 491,430.00 |
| 50,000 shares (Colton Loan collateral) | 1,506,875.00 |
| 25,000 shares (Combs Loan collateral) | 1,006,875.00 |
| Total | $20,731,156.37 |
| Total investment in both companies | $25,456,156.37 |

Loans to Cyrus Eaton, secured by West Kentucky stock tabulated above, commenced October 9, 1951. The Sagamore-Summit Corporation loans, secured by West Kentucky stock, started the same date as also did the Tower Industries, Inc. loans, secured by West Kentucky stock. The Colton loans, secured by West Kentucky stock, started October 28, 1955. The Chertsey Corporation loans, secured by West Kentucky Stock, started October 4, 1954. The Chertsey Corporation loans secured by Nashville stock, started September 5, 1955. The Sagamore-Summit Corporation loans, secured by Nashville stock, started September 6, 1955, as also did the loans to Tower Industries, Inc., secured by Nashville stock. The September 5 and 6, 1955 loans were made in connection with the acquisition of Nashville Coal Company by West Kentucky Coal Company.

The foregoing loans were evidenced by promissory notes, all of which were demand notes.

Chertsey Corporation, Sagamore-Summit Corporation and Tower Industries, Inc. were corporations affiliated with Mr. Cyrus Eaton. Mr. Cyrus S. Eaton, Jr. owned all of the outstanding stock of Sagamore-Summit Corporation. Tower Industries, Inc. stock was all owned by Mr. Eaton's children, their spouses or business associates. All of the stock of Chertsey Corporation was owned by Mr. Eaton and his children. Mr. Eaton handled the various transactions involved in these loans and the loans were spread between these various corporations for the convenience of these companies.

Each of the notes evidencing the above loans provided that the borrower might surrender the collateral to the holders of the note and relieve himself, or itself, from any further personal liability. However, according to Mr. Eaton it was not the understanding that United Mine Workers would suffer all the loss or that he or his companies would take all the gain under these transactions.

These demand notes were renewed annually and there was no understanding as to how long the process of replacing notes annually would continue. It was the understanding that UMW would retain the collateral until payment or surrender.

Some of the notes provided that interest would be one-half of the dividends paid under the collateral. In other notes interest was provided for but if no dividends were paid under the collateral, interest was not paid and it was the understanding that no interest would be paid if there were no dividends.

The Combs' loan was foreclosed by UMW. The form of the obligation under the Colton notes was identical with that under the Eaton and affiliated corporation notes. Mr. Colton was the President of the National Bank of Washington in which UMW at one time held the majority stock and UMW, in addition, loaned many millions of dollars to Mr. Colton in connection with the acquisition of the bank shares. Under the Colton notes the holder of the note was to receive any dividends under the collateral and no other provision was made for interest.

One of the most frequently stated reasons given by witnesses in interrogatory answers for the investments of UMW in West Kentucky Coal Company was that of giving employment to members of the Union. However, the President of West Kentucky Coal Company, Mr. Eastin, testified that in 1950, West Kentucky had 3,000 miners. He testified that there was a gradual reduction of the men as the mechanization program of the company had gone forward. He testified that in 1960 West Kentucky had 2,000 to to 2,200 men. When Mr. Lewis was asked about the investments on cross-examination he testified that the company had been paying substandard wages and had substandard working conditions.

The reason, frequently mentioned, that the working conditions and terms were substandard and far below the UMW

contract terms, was given by both Mr. Lewis and Mr. Owens. Mr. Eastin, however, testified that the West Kentucky Coal Company maintained a Welfare Fund into which the company paid the same amount as was paid under the UMW contract, even before the company signed a UMW contract. Mr. Eastin also testified that the wage scale of West Kentucky Coal Company was equal to or better than that in the UMW Agreement. Mr. Owens, on cross-examination, maintained that Mr. Eastin's testimony in this regard was not factually true. However, UMW counsel later produced as their own witness Mr. McMahon, who was Vice-President and Controller of West Kentucky Coal Company, and he substantiated the testimony of Mr. Eastin on cross-examination. Mr. McMahon further testified on cross-examination that Nashville Coal Company also paid a wage equal to the UMW scale, except for the omission of travel time.

A reason given to the membership for the investments by the International officers of the Union at the International Convention of 1960 was that "The West Kentucky Coal Company was breaking the price of coal down in every market that it could penetrate. The Indiana and Illinois production was constantly being attacked by the low wage scales paid in those mines and the sales marketing policy of this non-union coal company." Asked about this speech by him at the Convention, Mr. Owens testified: "What I was trying to convey in my humble way was that the wages paid to those men down there made it possible for this corporation to market coal under the wage structure that was affecting the employees that we represented in those markets where they were marketing their coal and as an institution we had a right to use the money to do it." Thus there is no conflict in the evidence that a reason for the acquisition of the West Kentucky investments was the previous policy of the company in dumping coal at low prices into the market, particularly the Illinois and Indiana market.

Another reason given for the investments upon which there is no dispute in the record, is that the Union had excess funds that it wanted to invest in order to make a profit. It is to be noted that if the profit-making motive was the sole motive, the form of the investment took a peculiar turn. A number of the notes show that the interest on the loans was to be only one-half of the dividends paid on the collateral and profits would have been greater, demonstrably, if the stock had been directly acquired rather than going through Mr. Eaton.

Mr. Lewis testified in 1961: "The Trustees of the United Mine Workers are satisfied with the investment in West Kentucky Coal Company and are quite content in the belief that, in the end, it will prove to be immensely profitable to the United Mine Workers of America in a financial sense; a wise investment of the funds."

Mr. Lewis' final testimony on this point was: Mr. Eaton was a man of acknowledged industrial success and one of the leaders in the financial and industrial world of the country whom I had known for a long time, and we invited him to make a joint venture with us in the West Kentucky purchase of stock, and we loaned him some money to buy stock —any profits occurring from the joint enterprise in the investment were to be split mutually, 50% to each. We could not ask Mr. Eaton to do so and lose his own money, so we divided the profit like joint partners in any enterprise.

West Kentucky Coal Company had 857,264 common shares of stock outstanding. The voting stock consists of the common stock and 50,000 shares of preferred stock.

The listing of the investments in West Kentucky Coal Company above shows that UMW owned the 50,000 preferred shares and owned or held as collateral 480,000 shares of the 857,264 outstanding common shares. Mr. Eaton and his associates assumed control of the Board of

Directors of West Kentucky Coal Company. Mr. Eaton was made a Director December 12, 1952. Mr. Cyrus Eaton, Jr. came on the Board March 9, 1953; Mr. Daley and Mr. LaFevre came on May 12, 1953; and Mr. Kaiser came on the Board May 15, 1958. Mr. Eaton became Chairman of the Board of Directors May 12, 1953.

That there was control here capable of being wielded in the direction of union policy is shown by Mr. Lewis' statement at the 1956 Convention: "When Mr. Eaton's interests bought the West Kentucky Coal Company, which was operating non-union for more than fifty years, his first official act was to have that corporation sign the industry agreement with United Mine Workers of America."

Counsel for UMW in oral argument stated that he was of the opinion that the loans and investments in West Kentucky and Nashville were for organizational purposes. With this opinion, the Court concurs.

Justice Goldberg stated in his dissenting opinion in the Pennington case, and found in his dissent in Local Union No. 189, Amalgamated Meat Cutters, etc. v. Jewel Tea Co., 381 U.S. 676, 734, 85 S.Ct. 1596, 1607, 14 L.Ed.2d 640, that the UMW had a right to make substantial investments in West Kentucky Coal Company and neither that nor its financing others in their acquisition of stock in West Kentucky Coal Company was a violation of the Sherman Act. He further stated that ownership of a controlling or substantial interest in a company which conspires with others in a violation of the antitrust laws does not in itself impose liability on the owner. The owner must be shown to have participated knowingly and actively in the alleged illegal activity. See United States v. Wise, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590.

On the bid opening of April 15, 1954, TVA awarded term contracts to a large number of eastern Kentucky and eastern Tennessee small producers. Under these contracts the average cost at the plant was approximately $4.50 per ton. This price is to be compared with the prices of West Kentucky Coal Company hereinafter listed on TVA contracts. In the Edition of the United Mine Workers Journal for July 15, 1954, there appeared an article which tabulated the awards by TVA of contracts to these east Tennessee and east Kentucky producers at the aforesaid bid opening. This article stated: "Evidence that TVA is still pursuing its short-sighted and dog-eat-dog policy of buying coal, is offered by the latest contract figures of coal bids awarded in early June for delivery to the Kingston, Tennessee Plant. Analysis of the coal awards above, most of which went to non-union companies and brokers who buy from small dog-hole mines that do not observe union wages, hours, Welfare or conditions, and also disregard state and federal safety codes and the Walsh-Healey Act, shows how the TVA coal purchase policy operates. Note the low prices of coal at the mines which even after transportation costs are still below the prices quoted by established operators and generally recognized as standard prices for the industry, * * *"

After the award of a TVA coal contract to Whitwell Coal Corporation one of the small mines in southeastern Tennessee after bid opening of December 16, 1954, there appeared an article in United Mine Workers' Journal, Edition of April 15, 1955, attacking TVA for this contract awarded to Tennessee small mines.

Mr. Kampmeier, a consulting engineer in private practice in Chattanooga, formerly worked for TVA as Assistant Manager of Power. He stated that TVA tried to build large steam plants near two or more coal fields; that it considered coal the more attractive fuel because of price. The steam plants were designed to burn a large variety of coal. Much of the coal was bought on long term. TVA encouraged the national competition in suppliers. Some of the bids were for spot orders. They were made so as to invite as many bidders as possible. TVA worked out transportation ar-

rangements with railroads and large barge lines. These things enabled TVA to purchase at lower prices than other utilities. It purchased coal at 15 cents or 20 cents per ton less at the mine than did other utilities. He saw no evidence that UMW or any coal operators were trying to hold down prices. The suppliers tried to get as high a price as they could. The availability of the spot and term markets was beneficial to suppliers. The market made the expansion in the use of coal possible.

Consolidation Coal Company played a small part in the TVA market. TVA tried to get it interested in the market. From 1952 to 1962, Consolidation never showed much interest in the market and supplied less than 10% of the coal even with its Pocahontas Mine. West Kentucky supplied about 5% and Nashville supplied less than West Kentucky. West Kentucky was less aggressive and not eager to go after the business. West Kentucky and Nashville combined supplied between 8% and 9%. Peabody was interested in the TVA market and expanded in the market. Its whole business was built on the steam market. Generally, Peabody expanded from 0 per cent to about 10 per cent as a result of the Paradise market. Island Creek was never important. It supplied less than 10% until it bought West Kentucky's coal properties. Pittston supplied about 5%. It had a mine in Monterey, Tennessee. Pittston's business with TVA diminished. The eight companies that are charged with being conspirators with the UMW to lower the price of the TVA

coal to squeeze the small operators out of business furnished less than 25% of coal to TVA during the period of 1952 to 1962. The coal from the west Kentucky fields do not compete with east Tennessee coal at the Kingston and John Sevier plants because of transportation costs. Prices at Kingston dropped faster and further than the prices dropped in the west Kentucky area because the price was very high in 1956 in the Kingston area. The Kingston plant operated at a higher capacity than the other TVA steam plants. That was because it was near Oak Ridge. Kingston Steam Plant built up an adequate stock pile by 1957 and this caused a cut back on purchases of coal by TVA. The transportation costs of coal purchased by TVA averaged less than one-half that of other utilities. The transportation costs of other utilities averaged more than $1.00 per ton.

Mr. Kampmeier testified that the quality of coal is a material element in its price. There is a big difference in the price of steam coal and metallurgical coal, the latter being about 50% higher.

TVA's attitude toward term contracts has changed. It at first thought that its original view of long term contracts was a mistake. This caused it to turn to a three-year contract. Later it began to make longer term contracts because it had learned more about the coal business.

TVA located its Paradise Steam Plant adjacent to the coal properties of Peabody Coal Company. Peabody is to furnish 65,000,000 tons over a period of over fifteen years at a price of $2.90.

Below is a ta ulation of the contracts awarded to West Kentucky Coal Company (and Nashville Coal Company after its acquisition by West Kentucky) by TVA on the term market after competitive bidding in the period of 1954 through May of 1959.

TVA Requisition 21–825509
West Kentucky Coal Company, 7,000 tons to 27,500 tons at $2.90, September 15, 1954;

TVA Requisition 21–825509, West Kentucky Coal Company, 7,000 tons to 27,500 tons, at $2.67, Sept. 15, 1954;

TVA Requisition 16–831970P, West Kentucky Coal Company, 3,000 tons per week for 21 months, at $2.32, May 19, 1955;

TVA Requisition 364, West Kentucky Coal Company, 2,000 tons per week for 18 months, at $2.68, Sept. 23, 1955;

TVA Requisition 364, Nashville Coal Company, 1500 tons per week for 30 months, at $2.31, September 23, 1955;

TVA Requisition 364, Nashville Coal Company, 2,000 tons per week for 12 months at $2.72, September 23, 1955;

TVA Requisition 364, Nashville Coal Company, 1,500 tons per week for 18 months at $2.49, Sept. 23, 1955;

TVA Requisition 11180, West Kentucky Coal Company, 3,000 tons per week for 36 months, at $2.80 July 12, 1956;

TVA Requisition 11180, Nashville Coal Company, 1500 tons per week for 12 months, at $3.21, Nov. 16, 1956;

TVA Requisition 23923, Nashville Coal Company, 4,000 tons per week for 36 months at $2.58, Oct. 24, 1957;

TVA Requisition 23923, Nashville Coal Company, 1,000 tons per week for 36 months, at $2.54, Oct. 24, 1957;

TVA Requisition 23923, Nashville Coal Company, 2,000 tons per week for 15 months, at $2.75, Oct. 24, 1957;

TVA Requisition 99095, Nashville Coal Company, 6,000 tons per week for 24 months, at a barge delivered price at Johnsonville of $3.95, May 20, 1958;

TVA Requisition 25, West Kentucky Coal Company, 5,000 tons per week for 18 months, at $2.66, May 5, 1959

———◆———

West Kentucky became the second largest shipper of coal to the TVA system. Several of the immediate competitors of that company in the west Kentucky field followed the lead of West Kentucky Coal Company with low bids, but generally less frequently and for smaller tonnage.

While this was going on UMW pledged $5,200,000.00 of its assets for a loan by the National Bank of Washington to West Kentucky Coal Company, September 21, 1956, for capital to expand the company's operations.

According to Mr. Kampmeier the price of steam coal in the West Kentucky field has been lower than in any other of the TVA supplying coal fields. Using statistics from the Federal Power Commission, Mr. Kampmeier pointed out that the average price for steam coal in western Kentucky District 9 was 12.56 cents per million BTU. In the eastern Kentucky, northern Tennessee, southwest Virginia

and southern West Virginia District 8, it was 14.34 cents per million. In Illinois District 10, it was 15.03 cents per million. In Ohio District 4, it was 15.20 cents per million. In Indiana District 11, it was 15.56 cents per million and in southeastern Tennessee-Alabama District 13 it was 15.82 cents per million. (The foregoing cost evaluations were f. o. b. the mines.) The average f. o. b. mine price for steam coal in western Kentucky according to Mr. Kampmeier was $2.95. Although TVA was an integrated system, with respect to the purchasing of coal for delivery to various plants of the system, TVA officials made it clear to the operators in Tennessee that if the Tennessee price was not competitive with the price at other plants the Tennessee market would be curtailed.

The history of Kingston pricing is:

| Bid Opening | Average cost per million BTU (in cents) | Typical Price per ton FOB mine | Company receiving this price | National Average price of Coal |
|---|---|---|---|---|
| 4/15/54 | 18.27 | $3.48 | Royal Fuel | 1954–$4.52 |
| 11/26/54 | $18.65 | 3.55 | Capitol | |
| 4/28/55 | 18.10 | 3.45 | Ramco | 1955–$4.50 |
| 8/30/55 | 19.04 | 3.41 | G & R | |
| 12/21/55 | 22.16 | 3.88 | Dean | |
| 2/21/56 | 23.49 | 4.15 | Straight Fork | 1956–$4.82 |
| 8/26/56 | 21.71 | 3.70 | Pemberton | |
| 11/16/56 | 21.69 | 3.72 | Kay | |
| 2/26/57 | 21.41 | 3.80 | Straight Fork | 1957–$5.08 |
| 5/8/57 | 20.93 | 3.90 | Clinchfield | |
| 6/6/57 | 20.04 | 3.84 | Holmes Darst | |
| 8/14/57 | No Awards | | | |
| 10/24/57 | 19.80 | 3.23 | Dean | |
| 1/30/58 | 19.88 | No FOB Mine | | |
| 5/20/58 | 20.18 | 3.55 | Whitley strip | 1958–$4.86 |
| 10/7/58 | 20.24 | 3.45 | Southern C & C | |
| 12/9/58 | 20.49 | 3.49 | Straight Fork | |
| 2/5/59 | 20.80 | 3.43 | Dean | 1959–$4.77 |

The problem with the Tennessee field in its competition with the west Kentucky field was in the difference in productivity. Mr. Kampmeier stated: "A southern Tennessee miner may produce 10 tons per day and a western Kentucky miner 20 tons. On this basis, the labor cost in a ton of Tennessee coal is about twice as high, perhaps as much as $2.50 a ton versus $1.25, plus 40 cents in each case for the UMW Welfare Fund. Such a difference is, indeed, a serious matter to the southern Tennessee producer, especially as wages increase. The April 1, increase of 80 cents a day is equivalent to about 8 cents per ton in southern Tennessee versus 4 cents per ton in western Kentucky."

With costs of production being raised year after year under the UMW contract, the Tennessee producers could not recover these increasing costs from the market, even though they had some of the largest steam plants in the country at their door steps.

*Relationship of West Kentucky Coal Company and Peabody Coal Company in the Marketing of Coal*

The West Kentucky Coal Company produces its coal from underground mines.

West Kentucky Coal Company has been engaged in the mining of coal since 1904, operating in Hopkins and Muhlenberg Counties, and also having operated at some times in Union County, with additional property in Webster County, Kentucky. Nashville Coal Company, acquired by West Kentucky Coal Company on September 13, 1955, likewise operated in Muhlenberg, Hopkins and Union Counties in West Kentucky. West Kentucky Coal Company sells to middle western utilities, chemical, cement and other industrial users, to an important Canadian clientele and to a strong group of retail and wholesale distributors to the commercial and domestic markets in the Great Lakes area, as well as in the south. Its primary market has been in the northwest, in the Chicago area and Iowa and Wisconsin. Other principal areas are western Tennessee and western Kentucky, in addition to Canadian customers to whom the coal is shipped through a terminal in Chicago.

Peabody Coal Company produces most of its coal by strip mining in the states of Oklahoma, Missouri, Illinois, Indiana, western Kentucky and Ohio. It has one large underground mine at Springfield, Illinois. It formerly sold its coal through its sales subsidiary, Southern Coal Company, but in recent years has abandoned that agency and sells itself, through its own sales department. Peabody serves most of the important electric utilities in the middle western area, including the Commonwealth and Edison System. The company has approximately 30 mines.

There are close operating and selling relationships between Peabody Coal Company and West Kentucky Coal Company. West Kentucky Coal Company, with enormous reserves of coal in the western part of Kentucky, leases land to Peabody, as well as to other companies, and retains an option to sell the coal produced on that land. West Kentucky Coal Company and Peabody Coal Company buy and sell substantial quantities of coal to and from each other.

The exchange of coal between the two companies for application on particular contracts is exemplified in the Tampa and Memphis utility markets. When West Kentucky Coal Company acquired Nashville Coal Company, it also acquired the Nashville contract with Tampa Electric Company, which called for the shipment of coal by Nashville to Tampa Electric Company on a long term contract for the requirements of the generating plant at Tampa. After the acquisition of Nashville Coal Company, West Kentucky spent many months of intensive work getting the facilities ready to handle the coal by the water shipment to Tampa. When time came to ship on the contract West Kentucky reneged on this contract and Tampa Electric Company brought a suit against the Company. West Kentucky took the position that the contract was invalid under the antitrust law because it had a monopoly on requirements of the electric company. There was factors in the contract that were not satisfactory to West Kentucky Coal Company. It developed that the Company was disappointed in the prospects for back haul of phosphate by water on the barges that brought in the coal. Also, West Kentucky desired to substitute an escalation clause that would tie increases of coal price to the rapid UMW contract cost increases. When West Kentucky renounced the contract, it was ready to ship the coal after spending many months in getting prepared. Other shippers would have to go through the same period of preparation. In this situation, the coal from the Uniontown mine of West Kentucky, which was supposed to supply the contract was largely diverted to the TVA spot market. After this development an arrangement was made by Tampa to obtain coal from the eastern Tennessee and east Kentucky area by rail, with a greatly reduced rail rate having been worked out. Under this arrangement Phillips Brothers Coal Company started shipping coal to Tampa. Then Peabody Coal Company came into the picture and obtained a term contract for supplying Tampa Electric Company.

It resulted that West Kentucky leased its water coal handling facilities in Louisiana to Peabody and West Kentucky was to share in the contract to the extent of one-half of the tonnage. After the Peabody contract Phillips Brothers Coal Company lost out in the Tampa market.

When the bid invitations came out from the Memphis Power plant contract for coal, according to the sales representative of Peabody Coal Company, there possibly were discussions about the invitations between Peabody, West Kentucky Coal Company, Pittsburgh-Midway Coal Company and Kirkpatrick Coal Company: "We might possibly have because there was a lot of negotiations down there selling it to them. If they could have, they would have bought the coal without submitting it to bids. They were just in that mood, and they made it clear—but at any rate, I don't recall discussing it or not. We might have. It would be a little natural down there we run together down there and have a drink or two together and we get pretty talkative. We might have talked to any of them. The City Manager was going to buy some coal, and we hoped we could get it and you discuss what you do and what they do—the competition was so hot that they split it. We had so many friends behind us all that they split it up." Both Peabody and West Kentucky obtained contracts at Memphis and Peabody is applying coal from West Kentucky Coal Company on its Memphis contract.

It is mentioned above that substantial quantities of Uniontown coal were diverted by West Kentucky Coal Company from the Tampa contract to the spot market of TVA. As stated above, the spot market of TVA was designed for small amounts of coal to fill in on requirements of plants where term contracts did not meet the requirements. In the years 1956, 1957 and 1958, including the period that the Uniontown mine coal was going into the spot market, West Kentucky and Peabody were bidding large quantities of coal on the TVA spot market and West Kentucky Coal Company, particularly, was doing this. An analysis was made of the spot award sheets of TVA and a tabulation was made of the extraordinarily large spot bids filed by West Kentucky and Nashville Coal Companies, Pittsburgh-Midway and Peabody Coal Company and Debardeleben and Truax-Traer Coal Companies. (The bids of the last two companies did not show dropping prices.) These were the only operating companies that repeatedly bid over 10,000 tons on the spot market with the exception of Old Ben Coal Company which bid a few times in 1958. West Kentucky and Nashville Coal Companies were bidding extraordinarily large quantities on the TVA spot market in comparison with all other companies. Their bids show a downward trend in the pricing and a number of contracts were awarded them on the basis of their bids for these extraordinarily large tonnages.

It was inevitable that this kind of bidding would have a depressing effect on the spot market of TVA. The kind of bidding the West Kentucky and Nashville companies were engaging in on the spot market is shown by the size of their actual sales on the spot market. As examples: In September, 1957, TVA purchased from Nashville and West Kentucky Coal Companies 38,000 tons of coal on the spot market. TVA purchased 38,000 tons from these companies in October, 1957. TVA purchased 60,000 tons from these companies in December, 1957, on the spot market. TVA purchased 66,000 tons of coal from these companies on the spot market in January, 1958. In May of 1958 TVA purchased 36,500 tons from these companies. In June, 1958, TVA purchased 28,000 tons of coal on the spot market from these companies.

A comparison of the average cost of coal at the Kingston Plant for the term and spot contracts shows that the spot market was depressed considerably below the term market. Bearing in mind that

a difference in cost per million BTU of one full cent is roughly equivalent to a difference of 25 cents per ton in price, this comparison is as follows:

| Term Bid Opening Date | Term Average Cost per Million BTU (in cents) | Spot Average Cost per million BTU this month (in cents) |
|---|---|---|
| 2/21/56 | 23.49 | 22.08 |
| | | 23.43 (April) |
| 8/26/56 | 21.71 | 20.06 |
| 11/16/56 | 21.69 | 19.54 |
| 2/26/57 | 21.41 | 19.61 |
| 5/9/57 | 20.93 | 18.98 |
| 6/6/57 | 20.04 | 19.17 |
| 8/14/57 | No awards | 18.50 |
| 10/24/57 | 19.80 | 17.92 |
| 1/30/58 | 19.88 | 18.71 |
| 5/20/58 | 20.18 | 19.02 |
| 10/7/58 | 20.24 | 18.45 |
| 12/9/58 | 20.49 | 18.31 |
| 2/5/59 | 20.80 | 18.78 |

TVA took into consideration the advantages of this kind of a market (the spot market) to small coal producers in establishing the spot bidding program. However, the UMW attacked the spot bid program of TVA. Mr. Lewis, in the 1956 Convention charged that the spot market program was an effort to avoid the minimum wage under the Walsh-Healey Act (which permitted an exemption of contracts for less than $10,000.00 in amount) and an effort to buy coal at a price less than what the "organized mines" were charging. Mr. Lewis said that this kind of program was "anti-social, un-American and double Dealing" on the part of TVA.

*Drive Staged by West Kentucky Coal Company and Peabody Coal Company in 1959 and later years for the TVA market*

On February 19, 1959, the Pleasant View mine of West Kentucky Coal Company worked out of its No. 11 seam and drove down into the underlying No. 9 seam opening this lower seam for operations on October 14, 1959. On July 27, 1959, West Kentucky Coal Company submitted a bid under TVA requisition 27, proposing to sell 16,347 tons per week for fifteen years from the Pleasant View mine, at a price of $2.90. TVA awarded a contract on this bid evaluating the bid for shipment to Shawnee Steam Plant. This was the West Kentucky Coal Company T-3 contract. As stated, the price of this coal was $2.90, which was substantially higher than the earlier contracts of West Kentucky with the TVA, as tabulated above.

After the award of the above contract, Mr. Hoffman, Vice-President for sales of West Kentucky Coal Company, approached TVA with respect to the selling of additional coal from the Pleasant View Mine. At the bid opening of February 9, 1960, under requisition 32, West Kentucky Coal Company filed a bid for the sale of coal from the Pleasant View Mine in the amount of 34,616 tons per week for a period up to 15 years, at the same price of $2.90. This time the other producers in the middle western field bid under West Kentucky's price of $2.90 and West Kentucky obtained no contract on this bid. At the same time West Kentucky bid at the same price for the same mine, in much smaller quantities and a much shorter term, without success.

West Kentucky Coal Company allowed TVA to keep this bid alive for a full year to be accepted at the option of TVA.

There ensued discussions concerning a much lower rail rate to the eastern TVA plants from the western Kentucky field to be negotiated by the rail carrier, L&N Railroad, with TVA under Section 22 of the Interstate Commerce Act. Discussions centering on the Widows Creek Plant were going on about this proposed rate for six months to a year before it was finally made official on August 29, 1960, effective October 1, 1960. The new rate for shipments was established at a flexible scale of $1.45 per ton, to $1.60 per ton, depending upon the tonnage carried on the L&N to the Widows Creek Plant. The amount of tonnage to determine which rate applied would include the coal shipped on the L&N from the southern Tennessee field to the Widows Creek Plant. Before this rate, the lowest transportation cost from the West Kentucky field to Widows Creek was $2.07 by using combined rail and barge movement through Grand Rivers, Kentucky.

Officials of West Kentucky Coal Company had discussed with the L&N Railroad this change in the rates to Widows Creek and also new rates to Kingston and the sales department of West Kentucky Coal Company had been very active in bringing about the Widows Creek Section 22 rate. West Kentucky Coal Company wanted to take credit for this reduced rate with TVA. In later testimony, Mr. Eastin, President of West Kentucky Coal Company, repeated that West Kentucky Coal Company considered that getting rate reductions was normal and that they wanted to get credit for this rate with TVA and that is what they did with respect to this Section 22 rate. At the time of the taking of Mr. Eastin's prior deposition the West Kentucky Coal Company had bids in with the TVA and this coal might be awarded at Widows Creek if the rate were established. About that time or on October 6, 1960, TVA had made awards based upon the bids filed and opened on September 1, 1960, and West Kentucky Coal Company was not successful on that bidding,

it having bid 19,250 tons per week for five years, with an option for an additional 19,250 tons a week from the Pleasant View Mine but this time the bid went up to $3.00 on its price from the previous $2.90 figure.

At the February 14, 1961 bid opening West Kentucky Coal Company again filed a $2.90 bid for the Pleasant View Mine for 19,250 tons per week, for ten years, with an option to TVA to elect to take an additional 19,250 tons per week for nine years by notice given prior to January 1, 1962. TVA elected to take the coal in the amount of 19,250 tons per week for ten years at the Gallatin Steam Plant. At the time TVA did not need the extra 19,250 tons per week and left the option dangling. Mr. Kampmeier pointed out that TVA had the right to move the coal under the West Kentucky Coal Company contracts to any other plant besides the plant at which the contracts were awarded. On December 29, 1961, TVA elected to take the extra 19,250 tons under the West Kentucky bid option.

At the bid openings of September 19, 1962, West Kentucky Coal Company obtained another contract for 9,700 tons per week for ten years at the $2.90 price from the Pleasant View Mine and the East Diamond Mine. The East Diamond Mine had worked out the No. 11 seam on December 23, 1960 and it opened the underlying No. 9 seam on July 25, 1962.

At the bid opening of October 15, 1963, West Kentucky Coal Company obtained another contract for 10,000 tons per week for ten years at the price of $2.90.

By 1964, under the foregoing contracts West Kentucky Coal Company was shipping to the TVA System 3,900,000 tons per year at the $2.90 price. Mr. Hicks points out that with the addition of the Memphis Steam Plant to the TVA System the total annual shipments to TVA from West Kentucky Coal Company aggregated 4,240,000 tons.

In the meantime, Peabody Coal Company had been greatly increasing its participation in the TVA market. For the July 27, 1959 bid opening, TVA issued an invitation in routine fashion stating

its intention to buy up to approximately 3,000,000 tons of coal a year and that it would consider bids for terms up to twenty years. In a lower paragraph there was language to the effect that in addition to the foregoing, TVA would consider other bids, if operators wished to offer tonnage for a starting date later than that specified. Peabody Coal Company was the only company that responded to the language in the lower paragraph and filed a bid for $2.95 under this language. As a result of this invitation and bid, and as noted previously, a contract was entered into calling for the shipment of 65,000,000 tons of coal by Peabody Coal Company to TVA for a new steam plant, one of the largest ones in the system, to be established by TVA adjacent to Peabody's property from which the coal was to be mined. The tonnage of 65,000,000 was to be shipped at a rate of 80,000 tons per week until the contract was completed. This would mean an annual shipment to TVA of 4,000,000 tons for this one contract.

At the same bid opening of July 27, 1959, Peabody Coal Company received another contract awarded September 30, 1959 for a five year term for 20,000 tons per week. This meant an additional 1,000,000 tons per year from Peabody Coal Company to the TVA system until October of 1964.

In addition, on the bid opening of July 17, 1961, Peabody Coal Company received a contract dated August 10, 1961, for a three-year term of 3,000 tons per week, making an additional 150,000 tons a year to expire in August of 1964. Also, at the bid opening of December 7, 1961, for a three-year term for 1500 tons per week, making 75,000 tons annual shipments to expire in December, 1964. Then at the bid opening of October 15, 1963, Peabody Coal Company received a contract dated December 12, 1963 for a ten-year term for 15,000 tons per week, making an annual shipment of 750,000 tons. Thus the total shipments that Peabody Coal Company had to the TVA System through most of the year 1964 was at the rate of 5,975,000 tons per year.

Adding the annual shipments of West Kentucky Coal Company in 1964, of 4,240,000 tons to the Peabody Coal Company annual shipment of 5,975,000 tons, would make an annual shipment of 10,215,000 per year for these two companies alone. In 1963, the total amount of coal received by all of the TVA plants was 20,717,000 tons. Accordingly, Peabody Coal Company and West Kentucky Coal Company together had built up a tonnage to TVA of approximately 50% of the total receipts.

In addition, Pittsburgh-Midway Coal Company secured a contract under the bid opening of June 19, 1963, for 12,500 tons a week for fifteen years; the contract under the bid opening of October 15, 1963 for 12,500 tons for fifteen years; a contract under the bid opening of October 20, 1960 for 5,000 tons per week for ten years. These contracts aggregated 1,500,000 tons per year for Pittsburgh-Midway Coal Company in the TVA market for many years into the future.

And, also, Kentucky Oak Mining Company now provides 2,000,000 tons per year to the TVA market by reason of contracts one of which was awarded on the bid opening of July 27, 1959, for 8,500 tons per week for ten years and on bid opening of February 20, 1962, another contract for 30,000 tons per week for 15 years. This is the company that acquired leases in the Hazard field of East Kentucky from North Fork Coal Company after North Fork received a loan of $1,500,000.00 from the National Bank of Washington, secured by pledge of equivalent assets of United Mine Workers for the purpose of accumulating the leaseholds in the Hazard field.

Thus, between 1959 and 1964 the four companies, West Kentucky Coal Company and Nashville, Peabody, Pittsburgh-Midway, and Kentucky Oak, took approximately 13,700,000 tons of TVA's annual requirements of approximately 21,000,000 tons, leaving the balance to be scrambled for by the many smaller companies for whom TVA was the principal market. The effect on prices at Kings-

ton in this period is shown by the average term contract costs at that plant as follows:

| Bid Opening Date | Average Cost per Million BTU (in cents) |
|---|---|
| 5/5/59 | 21.57 |
| 7/27/59 | 21.62 |
| 9/17/59 | 20.96 |
| 2/9/60 | 20.08 |
| 9/1/60 | No awards |
| 2/14/61 | 18.97 |
| 7/17/61 | 18.55 |
| 12/7/61 | No awards |
| 2/20/62 | 18.85 |
| 9/18/62 | 18.65 |
| 1/15/63 | 18.72 |
| 6/19/63 | 19.61 |
| 10/15/63 | No awards |
| 3/3/64 | 19.36 |
| 10/20/64 | 18.82 |

Before UMW started making its investments in West Kentucky Coal Company, that Company had a profitable business. It made a profit of $4,645,000.00 in 1950 and a profit of $4,223,000.00 in 1951. Thereafter its profit declined sharply and in 1958 and 1959 it had very substantial operating losses.

Obviously, the West Kentucky Coal Company has concentrated on the TVA market. In 1964, West Kentucky was shipping 4,240,000 of TVA out of a total production of 8,000,000 tons of the company. This was true although the prices the company was getting for coal in the other markets was higher. The annual report of the company for 1958 reported an impressive and diversified roster of customers in the middle western and Canadian markets. This was a true description of the clientele of the company. The western Kentucky coals are prominent in the mid-western utility market and that market has held up well price-wise. But, West Kentucky Coal Company was concentrating on the TVA market, which was a depressed market considerably below the middle western utility market.

The record contains an exhibit which includes the contracts for the sale of coal by West Kentucky Coal Company six months prior to, and six months after, the making of the February 14, 1961 contract with TVA. It contains the sales of coal in excess of 10,000 tons (excluding retail or domestic coal) to other customers besides TVA for that period of time. There was only one sale of coal in that entire period at a price as low as the 4,000,000 tons that West Kentucky sold to TVA at $2.90. The prices in the exhibit range from $2.90 to $7.15. The exhibit contains 300 sales.

UMW sought to bring out that different coals bring different prices according to size and treatment. But, the last mentioned exhibit includes all kinds of sales, including all of the sales to utilities by West Kentucky Coal Company in the period involved. It includes the sales of carbon coal which is the lowest form of coal and these sales were made at prices ranging from $2.90 to $3.85. But the contracts of West Kentucky Coal Company with TVA did not call for carbon coal. They required run-of-mine coal and carbon coal was not allowed to be shipped on these contracts.

The $2.90 price that West Kentucky charged TVA in the 1959–1963 period was considerably higher than many contracts West Kentucky bid for and secured from TVA in the earlier period when it established itself as the largest shipper to TVA.

The market quotations give no price nearly as low for western Kentucky coal as the $2.90 price, even for screenings. Mr. Eastin testified that the Company was making no analysis of profit on TVA contracts. Mr. Bowden, Vice-President in charge of sales, testified that he knew the prices were low.

Through all of this, UMW held securities representing the control of the company. Through the downward spiral of the West Kentucky profits, the sales department of West Kentucky was given an absolutely free hand to conduct the enormous low-priced sales to TVA.

When West Kentucky Coal Company acquired Nashville Coal Company it inherited from the latter a contract with Louisville Gas and Electric Company under which Louisville bought coal from West Kentucky Coal Company at a price originally at $3.21 but which raised by escalation to $3.55. Louisville owned the Cherry Hill mine and under the contract the West Kentucky Coal Company was obligated to sell as sales agent 200,000 tons of the Cherry Hill coal at a price 15 cents higher than the price charged Louisville for the coal shipped by West Kentucky to Louisville. In August and September of 1960, substantial quantities of the Cherry Hill coal were applied on the TVA contracts of West Kentucky and the price that West Kentucky received under the TVA contracts for this coal was approximately $39,000.00 less than the price that West Kentucky paid to Louisville for this coal. In August through December of 1962 considerable quantities of the Cherry Hill coal were applied by West Kentucky on the TVA contracts and the loss suffered on this coal amounted to approximately $111,000.00.

The West Kentucky witnesses maintained that the Cherry Hill Coal was difficult to sell, even at the $2.90 price. However, the Cherry Hill tonnage was shipped to Louisville Gas and Electric Company and also was sold to the general market, industries, retail dealers, etc. The larger sizes of the Cherry Hill coal were screened off and sold at higher prices and the evidence contained at least one sale of the residual unwashed carbon coal from Cherry Hill, sold in the Louisville market for $2.95. Moreover, it is to be observed that West Kentucky was willing to raise the quantity of the Cherry Hill coal for which it was obligated from 200,000 tons to 400,000 tons in 1958.

The principal mine of West Kentucky shipping on the TVA contracts made in 1959 and later years was the Pleasant View mine. This mine opened up the No. 9 seam October 14, 1959, after the July 19, 1959 TVA contract. In the remaining three months of 1959, the monthly cost per ton of the Pleasant View coal, including production and administrative costs, ranged from $2.90 to $3.03. The TVA price was $2.90. This is the cost experience that West Kentucky had to rely on when it made its February, 1960 bid to TVA at the same $2.90 price, for 34,616 tons per week for fifteen years. The September 1, 1960 unsuccessful bid of West Kentucky to TVA for 34,650 tons per week was filed at a price of $3.00 and the term was shortened from three to five years. The average cost per ton at the Pleasant View mine for the entire year of 1960 was $2.925. And this was the cost experience that West Kentucky had when it filed its February, 1961 bid at the $2.90 price for 19,250 tons per week for ten years and option tonnage for an additional 19,250 tons per week for nine years and this was a bid that was successful. In 1961 the average cost at the Pleasant View mine was $2.697 and in 1962 it was $2.72. After that the cost of the coal went up at the Pleasant View mine to $3.21. In the year 1963 the cost went up to $3.40 per ton at Pleasant View. On May 29, 1965 the Pleasant View Mine was closed.

The West Kentucky Company witnesses maintained that the Pleasant View mine ran into difficult conditions.

After the 1959 and 1961 TVA contracts West Kentucky Coal Company began to fall behind in its Welfare Fund obligations. The Company went to United Mine Workers and obtained a series of loans aggregating $900,000.00 to maintain the currency of its Welfare Fund obligations.

On September 23, 1963, UMW took a loss of $8,000,000.00 in the West Kentucky venture. UMW took the collateral held under the Eaton loans and cancelled the loans because Mr. Eaton could not pay the amounts due and the stock became the property of UMW which was sold to Island Creek Coal Company.

West Kentucky Coal Company, although it had a large number of diversified customers in other areas, continually

concentrated on placing the bulk of its tonnage on the TVA term and spot markets at low prices.

Plaintiffs insist that the foregoing facts establish a conspiracy among TVA and some of the large coal operators, including West Kentucky Coal Company, to take over the TVA market and that one of the methods used was to make bids on spot market awards at prices that were very low and sometimes below cost of production for the purpose of squeezing the small operators, including plaintiffs, out of the market and that they were largely successful in their purpose; that UMW financed the West Kentucky Coal Company while it was engaged in its nefarious methods to capture the TVA market.

The defendant says that the following facts show that West Kentucky and its alleged co-conspirators followed accepted business practices in submitting bids and they did not bid the low prices or prices below cost; and did not submit bids to depress coal prices for the predatory purpose of eliminating any of their competitors from the market.

### 1952–1962 Period
### Consolidation Coal Company

During most of the period material to this case Consolidation Coal Company was the largest coal company in the United States. It was never, however, very important in the TVA market. Though TVA officials met with high officials of Consolidation Coal Company to encourage that Company to engage in experimental work, the Company failed to show much interest in the TVA as a market for its coal. Consolidation Coal Company acquired Pocahontas Coal Company during this period and prior to that Pocahontas had acquired the Moore mining properties in Anderson County, Tennessee. Coal has been sold from these mines to TVA, though not on an extensive basis. Consolidation and Pocahontas together supplied TVA with less than 1% of TVA's coal during the period 1952–1962.

### Island Creek Coal Company

This company played no part in the TVA market until its acquisition of West Kentucky Coal Company in 1963.

### Peabody Coal Company

Peabody Coal Company was not a significant supplier of coal to TVA during the early 1950's. Upon its merger with Sinclair Coal Company, following which the Kelce Brothers became the managers of the company, Peabody became an important supplier of TVA coal. The company evidenced interest in responding to the new markets created by power systems, including TVA, and it has since expanded rapidly in terms of production, sales and earnings. The amount of coal supplied by this company grew from less than 5% of TVA's supply to 10% or more by 1962. Also, during this period TVA negotiated a very large contract with Peabody Coal Company for the supply of coal to the Paradise Steam Plant. Deliveries began on this contract after 1962.

### The Pittston Company (Clinchfield Coal Company)

This company has been of moderate importance to the TVA's program. This company has operated a mine near Monterey during much of this period and also it developed a major mine, the Moss No. 3 Mine, in western Virginia during this period. One of the reasons the John Sevier Steam Plant was located in upper east Tennessee was because it made Virginia mines available to TVA. Clinchfield supplied TVA substantial quantities of coal from its Moss No. 3 mine during a portion of this period. It was understood, however, that Clinchfield had developed its Moss Mine largely to supply a power plant built by the Appalachian Power Company on the upper Clinch River in Virginia and accordingly TVA did not obtain long term contracts for coal from Clinchfield. Upon development of the Appalachian Power Company's market Clinchfield's western Virginia mine has diminished greatly in importance to TVA. Clinchfield supplied approximately 5% of TVA's requirements during the 1952–1962 period.

### West Kentucky Coal Company and Nashville Coal Company

During the early part of the period, Nashville Coal Company was owned by Mr. Justin Potter. Potter was "philosophically opposed" to TVA and sponsored newspaper advertisements criticizing TVA. His company nevertheless supplied approximately 5% of TVA's requirements prior to the sale of Nashville Coal Company to West Kentucky in the fall of 1955.

Mr. Kampmeier described West Kentucky Coal Company as being quite different from Nashville in that it was a more conventional type operation. West Kentucky Coal Company, at the time TVA's coal market began to grow rapidly, had "about as large, and not fully loaded, coal mining capacity as any potential supplier we had" and it was important in TVA's coal supply picture.

Mr. Kampmeier termed the bidding practices of West Kentucky as somewhat less imaginative than those of Nashville and he stated that West Kentucky "did not seem to me to be as interested in the new type market that the power systems were creating as compared to the older type of markets as some of the other companies."

After its acquisition of Nashville Coal Company, West Kentucky Coal Company and Nashville combined supplied between 5% and 10% of TVA's coal requirements. Its percentage has recently grown to approximately 17% because of long term contracts awarded to West Kentucky. West Kentucky is the second largest supplier of TVA at the present time. Peabody's Paradise contract, together with its other contracts, makes Peabody the largest supplier of coal to TVA.

### Pittsburgh-Midway Coal Company

This company supplied approximately 2% of TVA's coal requirements during the 1952–62 period. In this regard, Pittsburgh-Midway compared with several companies, including General Coal Company (which actually supplied more than 2%), Tennessee Products and Chemical Corporation, Old Ben Coal Company, Freemon Coal Mining Company, Lafayette Coal Company, Coiltown Mining Company, Bell and Zoller Coal Company, United Electric Coal Company and Tennessee Consolidated Coal Company.

Kampmeier observed no efforts on the part of any of the alleged conspirators to hold down the price of coal to TVA. To the contrary, it was observed that these suppliers tried to get the best price they could. He believed it was "quite obvious" that this was the case.

### West Kentucky Coal Company's Shipments to TVA

The following table shows the annual shipments made by West Kentucky to TVA and also the percentage of TVA coal supplied by West Kentucky during the period material to this case.

| Year | TVA Total Receipts | Tonnage Shipped by West Kentucky & Nashville Coal Inc. | Percent of Company Shipments to Total |
|------|------|------|------|
| 1954 | 10,196,290 | 978,824 | 9.6 |
| 1955 | 14,377,000 | 1,298,923 | 9.0 |
| 1956 | 20,354,000 | 1,511,987 | 7.4 |
| 1957 | 19,581,879 | 963,384 | 4.9 |
| 1958 | 17,033,466 | 1,094,396 | 6.4 |
| 1959 | 17,808,900 | 1,336,870 | 7.5 |
| 1960 | 18,886,000 | 1,575,000 | 8.3 |
| 1961 | 18,674,000 | 1,681,000 | 9.0 |
| 1962 | 19,172,000 | 2,000,000 | 10.4 |
| 1963 | 22,141,000 | 3,394,000 | 15.3 |
| 1964 | 22,847,000 | 3,700,000 | 16.2 |

The Nashville acquisition occurred effective October 1, 1955, and hence the sales of that company are included beginning as of that date. It is significant that West Kentucky's participation was at its lowest point in 1957 and 1958— years in which plaintiffs claim it was depressing the market. In 1957 West Kentucky's deliveries to TVA dropped by one-third, or 550,000 tons. This drop accounted for roughly three-fourths of TVA's decline in shipments for the year 1957.

The plaintiff coal companies have pointed to the mine prices of bids offered by West Kentucky Coal Company during the period 1954–1959 as evidence of plaintiffs' contention that West Kentucky bids were intended to depress. These prices are compared with prices of coal of a much higher quality coal sold in a market where it enjoyed a substantial transportation advantage.

The bids submitted by West Kentucky during the material period were within the limits of existing competition.

Coal offered the TVA from the western Kentucky field was at lower mine prices than that offered from east Tennessee and southern Tennessee. The western Kentucky coal, however, is inferior in quality to Tennessee coals, averaging 11,800 BTUs as opposed to over 13,000 BTUs, or a difference in quality of more than 60 cents per ton on the TVA market.

None of the western Kentucky mines competed at the steam plants at which the plaintiff coal companies sold their coal. The western Kentucky companies were not competitive at those plants (Kingston and John Sevier) because of transportation costs.

Though TVA is an integrated system, the price of coal offered by West Kentucky and other mines in that field did not directly or materially affect the quantity of coal purchased by TVA for use at Kingston. The competition among east Tennessee mines, and not prices charged in fields not serving the eastern steam plants had the immediate and direct bearing on the price at those plants.

The price of coal offered by West Kentucky was not fixed for any purpose other than legitimate business purposes.

*West Kentucky and Nashville Bids on the TVA Spot Market, 1956–1958*

Plaintiffs state that in 1956 the prices on the TVA spot market were at substantially the same level as term market prices and that this fact is evidence of a conspiracy. The 1956 prices on the spot market at Kingston were at an exceptionally high level because of a critical but temporary shortage at that plant and once the shortage was overcome, the curtailment in purchases by TVA resulted in the decline in prices.

The decline in the spot market began in 1956. No West Kentucky coal was sold on the spot market in that year.

Normally the fluctuations of coal the TVA purchases on the spot market is not a significant factor in the operation of the TVA plants.

Bids made on the spot market by West Kentucky in 1957 and 1958 were evaluated at the Colbert and Shawnee plants and never at the Kingston or John Sevier plants.

The bids on the spot market made by West Kentucky from the Uniontown mine in 1957 and 1958 were made for lawful purposes and do not evidence a conspiracy. There were 26 such bids over the period February 1957 through March 1958. Of these, six were successful. On the declining spot market West Kentucky did not lead but followed the market and on the few occasions it was a successful bidder, it was the highest, or nearly so, of the successful bidders.

A review of the Uniontown bids shows that the first eight of these bids submitted from Uniontown ranged well above the market price per million BTUs. (1 cent per million BTUs is about $0.25 per ton.) Its last bid of these eight unsuccessful bids was at $3.70 per ton and was evaluated at Shawnee at 16.68 cents. Its ninth bid was at the same price ($3.70) and was successful, West Kentucky quoting the highest price of the successful

bidders. Its tenth, eleventh and and twelfth bids, also at $3.70 per ton, were unsuccessful. Its thirteenth bid was at $3.70 but with an improved guarantee, resulting in an evaluation of 16.49 cents, and was successful. West Kentucky's bid was again the highest successful bid. Its fourteenth and fifteenth bids continued at $3.70 and were unsuccessful. Its sixteenth and seventeenth bids were also at $3.70 and at the same evaluation, but were successful. In the former it was the highest successful bidder; in the latter there were several lower bids to Shawnee and TVA made awards on these lower bids but placed the coal to other plants. These bids were followed by two unsuccessful bids at the same price ($3.70) and evaluation. The highest successful bidder on the latter was evaluated at 16.16 cents, and on its next bid (of December 12, 1957) West Kentucky reduced its price to $3.62 with an evaluation of 16.16 cents. Its bid was successful, being the second highest of all offered. There were no unsuccessful bidders at Shawnee on this occasion. Its next bid, made at the same price, was unsuccessful. Its next bid at $3.58 per ton, or 15.99 cents, was successful and on this occasion 73,900 tons were bid unsuccessfully as low as 16.01 cents. Its remaining bids, respectively at $3.58, $3.58, $3.55, $4.00, $4.00 and $3.55 were unsuccessful.

The bids reviewed above were motivated by a need for sales. West Kentucky's Hoffman testified that the spot bids from Uniontown were made "to relieve the situation at our Uniontown Mine * * * until such time as I could obtain a term contract." He denied that they were made to harm any producer.

West Kentucky acquired the Uniontown mine in October 1955 as a part of the Nashville Coal Company acquisition. Uniontown, designed to produce 1,700,000 to 1,800,000 tons annually, was a barge mine without rail connections—the only mine of that type owned by West Kentucky. West Kentucky owned its own barge equipment and bid TVA a delivered price from Uniontown to enable it to use that equipment.

As a part of its 1955 Nashville transaction, West Kentucky acquired two contracts which contemplated shipment from Uniontown. Both contracts, because of their termination, are of significance in this case. One was a three-year TVA term contract for 350,000 tons a year. This contract expired in June, 1957. The other was a twenty-year total requirements contract with Tampa Electric Company providing for shipment of at least 450,000 tons per year. In April, 1957, West Kentucky advised Tampa it would not perform the contract because, in West Kentucky's view, it was void under the antitrust laws. During the spring and summer of 1957, while negotiating for settlement of the contract controversy, West Kentucky shipped 118,000 tons from Uniontown to Tampa on spot orders. Settlement negotiations failed and Tampa refused to order further coal from West Kentucky. The loss of sales for the tonnage which had gone to TVA and Tampa and also some barge coal to Chicago through Mount Vernon, Indiana, resulted in West Kentucky's bids on TVA's spot market from Uniontown.

West Kentucky's position in the TVA term market indicates why it was necessary to bid on the spot market:

| Year | TVA Coal Receipts | West Kentucky (and Nashville) Shipments | Type Sales | Percent of TVA Market |
|------|------|------|------|------|
| 1954 | 10,196,290 | 978,824 | | 9.6 |
| 1955 | 14,377,000 | 1,298,923 | | 9.0 |
| 1956 | 20,354,000 | 1,511,987 | All Term Includes | 7.4 |
| 1957 | 19,581,879 | 963,384 | 313,000 spot | 4.9 |
| 1958 | 17,033,466 | 1,094,396 | 198,000 spot | 6.4 |

These figures show no spot sales by West Kentucky in 1956. They also show a drastic fall in West Kentucky's total sales to TVA in 1957 and 1958. During these years West Kentucky sold less than 900,000 and 600,000 tons, respectively, on TVA's term market as compared with 1956, the year it acquired Nashville.

*West Kentucky Profits During the Period 1950–1964*

Plaintiffs claim that West Kentucky's profits of over $5,000,000.00 in 1950 before taxes and the decline in profits thereafter show that West Kentucky was losing money on its TVA contracts by reason of its low bids which were made for the predatory purpose of squeezing them out of the market. The evidence indicates that the variations in West Kentucky profits resulted from factors unrelated to predatory pricing.

The following table shows the situation not only in profit, but also in terms of production in tons and sales in tons. It also shows another significant fact in the industry—the decline in national production.

| Year | Tons Production | Tons Sales | Net Income Before Income Taxes | Tons National Production |
|------|------|------|------|------|
| 1950 | 6,456,136 | 6,473,135 | $5,645,919 | 516,301,000 |
| 1951 | 5,513,890 | 5,466,189 | 4,223,814 | 533,600,000 |
| 1952 | 5,738,617 | 5,790,072 | 3,864,129 | 466,800,000 |
| 1953 | 5,080,565 | 5,182,814 | 2,721,133 | 457,290,000 |
| 1954 | 4,849,854 | 4,734,806 | 1,385,096 | 392,000,000 |
| 1955 | 9,736,007 | 12,296,048 | 1,441,367 | 470,000,000 |
| 1956 | 9,374,205 | 12,705,646 | 2,150,971 | 500,000,000 |
| 1957 | 7,724,999 | 8,789,215 | 1,376,377 | 490,000,000 |
| 1958 | 6,984,695 | 7,554,539 | (376,516) | 405,000,000 |
| 1959 | 7,451,924 | 7,450,831 | 435,841 | 410,000,000 |
| 1960 | 8,438,331 | 7,717,910 | 725,705 | 413,000,000 |
| 1961 | 6,873,850 | 7,362,058 | 203,597 | 403,000,000 |
| 1962 | 6,570,131 | 7,457,257 | 327,724 | 424,000,000 |
| 1963 | 7,226,176 | 8,135,799 | 322,449 | 456,000,000 |
| 1964 | 7,924,807 | 8,042,357 | 2,147,311 | 485,000,000 |

The explanation for the decline in the early 1950's is found in the testimony of J. W. McMahon, retired vice-president and controller of West Kentucky, and C. M. Hicks, West Kentucky's vice-president and sales manager. Hicks explained that in the late 1940's and early 1950's fifty per cent of West Kentucky's business was highly profitable retail dealer business and 25% was rail coal. Today 7% is retail dealer trade and less than 1% is for rail. This business was at a "fairly high price." West Kentucky also had a decline in sales. Sales, as shown in the annual reports, declined from $26,000,000 in 1950 to $22,000,000 in 1951; to $21,-000,000 in 1952; to $18,000,000 in 1953; to $15,000,000 in 1954 and to $17,000,000 in 1955. The downward trend in sales is closely followed by the downward trend in profits, and clearly refutes the assertion of predatory pricing.

The acquisition of Nashville occurred in 1955 but the earnings records of the two companies were kept separately until 1957. Nashville sustained a loss of $604,-057 in 1956. The combined income of Nashville and West Kentucky for 1956 was $1,591,000 before taxes.

Several factors explain West Kentucky profits from 1957 to date. The cost of interest in financing the acquisition of

Nashville accounts for much of the difference in earnings before and after the acquisition, as shown in the following table:

| Year | Stated Income (Combined) | Interest | Income Before Interest |
|------|-------------------------|----------|------------------------|
| 1956 | $1,591,000 | $ 492,354 | $2,083,354 |
| 1957 | 1,376,377 | 596,346 | 1,972,723 |
| 1958 | (367,516) | 1,027,532 | 660,016 |
| 1959 | 435,841 | 875,083 | 1,310,924 |
| 1960 | 725,705 | 739,203 | 1,463,908 |
| 1961 | 203,597 | 585,698 | 789,295 |
| 1962 | 327,724 | 554,117 | 881,841 |
| 1963 | 332,449 | 693,372 | 1,025,821 |
| 1964 | 2,147,000* | 104,605 | 2,251,605 |

* Includes gain on sale of capital asset of approximately $1,900,000.

———◆———

Another factor with regard to Nashville was the high cost of operating its mines. One of the five mines acquired, Stoney Point, had to be closed in 1957. Another, the Kirk mine, for which Nashville was sales agent, had to be closed for lack of markets. Still another factor is found in the increased labor costs at Nashville. Prior to its acquisition Nashville paid the Union scale, but obtained nine hours work rather than eight, as would have been the case under the UMW agreement. Extension of the UMW agreement to the Nashville employees resulted in an increase in production costs of over 19 cents per ton.

Plaintiffs have referred to contracts West Kentucky obtained for delivery to plants in the western end of the TVA system as evidence of an intention on its part to willfully depress the TVA market. These contracts called for a mine price of $2.90 a ton. As related below, the availability of this coal to West Kentucky without substantial development costs prompted the bid. The price of $2.90 was competitive, and in fact was frequently rejected by TVA during this period as being too high. The coal was offered by West Kentucky at that price to its other utility customers but by and large it could not be sold at that price elsewhere because of its quality. The price was established by West Kentucky at a figure from which it could make a profit and it has realized a profit thereon.

There are four $2.90 contracts to be considered. These contracts are the T3, T24, T18 and T6 contracts. The T3 contract was obtained under Requisition 27 on bids opened in July of 1959 for delivery of 16,347 tons per week for fifteen years to the Shawnee plant. The first award under the T24 contract was obtained under Requisition 27 on bids opened in February of 1961 for one million tons per year. An award of a second million tons per year was made in January of 1963 under this contract. The T24 contract was made for delivery of coal to Gallatin. The T18 contract, which was for 9,700 tons per week for ten years, was made in April of 1963 for delivery to Shawnee. The T6 contract was made for delivery to Gallatin under TVA Requisition 44 in October of 1963.

The coal offered on these contracts was No. 9 seam mine run coal and the West Kentucky mines known as Pleasant View and East Diamond have been the chief source of supply. As far as West Kentucky is concerned $2.90 is a standard price for that coal and it has been offered to a number of other utilities at the same price.

At the time West Kentucky first offered this coal to TVA in 1959, it was in

the process of working out its No. 11 seam at the Pleasant View mine. It could continue the operation of that mine quite easily and cheaply by driving down 90 feet to the No. 9 seam. To be able to sell the No. 9 coal in this way meant that the company could continue to utilize its tracks, its preparation plant, its loading plant and much of the other items originally constructed in connection with the mine. If the company was unable to sell the coal, these items would be abandoned. The No. 9 coal unprepared does not have a market other than the utility market and even with preparation it does not enjoy a volume market. West Kentucky had tried to sell it as washed coal and had found a preference for No. 11 coal because it was lowest in ash content. West Kentucky arrived at the price of $2.90 after discussions among the operating, sales, accounting, and management people, and it was believed that coal could be mined profitably at that price. There was no intent to depress the market in offering the coal at $2.90.

After it was awarded its T3 contract in 1959, West Kentucky sought to place more of this coal inasmuch as the Pleasant View mine was capable of producing more coal than its 1959 contract required. West Kentucky wanted to get Pleasant View to maximum production. West Kentucky worked out the No. 11 coal in East Diamond, in December, 1960, and it closed that mine because it did not have a market for its No. 9 coal. East Diamond was reopened in July, 1962, after the contract was finally obtained for the sale of the No. 9 coal from that mine.

The price of $2.90 was fixed by the operating and sales personnel of West Kentucky. During 1959, while the No. 9 seam at Pleasant View was in the development stage and production was at a low level in terms of the potential of the mine, production costs were at $2.729 per ton. Substantially the same production costs were experienced under similar circumstances in 1960. These costs were before a fixed administrative cost of 20

cents per ton, but this cost would have been borne by the company regardless of whether it had had the contract. Operating costs, excluding the 20 cent administrative cost, was $2.497 in 1961 and $2.52 in 1962. In 1963 a bad mine fire at Pleasant View caused operating expenses to increase and this finally required the closure of the mine. Meanwhile the No. 9 seam at East Diamond was opened in 1963. (This mine had been closed in 1960 when it worked out the No. 11 seam, even though the No. 9 coal was available, because it could not then market the coal to TVA or elsewhere at the $2.90 price.) In 1963 the operating cost at East Diamond was $2.13, and in 1964 it was $2.523. Because of the premium provisions of the contracts West Kentucky realized about $3.04 per ton rather than the basic $2.90 per ton on these contracts. Its operating profit on the contracts ranged from a low of 33 cents (except for the period following the fire at Pleasant View before that mine was closed) to a high of 91 cents, before allocation of the fixed administrative costs of 20 cents.

The price offered by West Kentucky on the $2.90 contracts appears to have been a matter of sound business judgment and is not evidence of predatory pricing.

From a competitive standpoint, the $2.90 bids were not, according to TVA's Kampmeier, "Particularly attractive to TVA." This is borne out by a review of the other bids evaluated by TVA at the same time. Most of West Kentucky bids were evaluated at the Shawnee, Johnsonville, Gallatin and Colbert steam plants. After a reduction in the rail rate from western Kentucky to Widows Creek in 1960 the bids were also evaluated at that plant. Hence, West Kentucky's bids were in competition with the bids of other companies evaluated at each of those plants.

Several bids were submitted by West Kentucky of its No. 9 coal. It appears that the No. 9 coal was offered to TVA eight times and the competition was such that the bids resulted in awards on only four occasions. On the occasion of

the first contract (July 27, 1959), West Kentucky was fourth from low of the bidders evaluated at Shawnee. The coal was next offered by West Kentucky on February 9, 1960 at $2.90, but it did not receive an award. At this bidding, West Kentucky's bid was next to last out of twenty bids and sixteen of the twenty bids were at mine prices below $2.90. On the next bid opening (September 1, 1960), West Kentucky again failed to sell its No. 9 coal. Each of the 24 bids showing a mine price was below the mine price offered by West Kentucky with prices ranging from $2.00 to $2.85 per ton. On the next bid opening (February 14, 1961), West Kentucky obtained a contract for delivery to Gallatin where its bid ranked third out of six considered. The two lower bidders offered mine prices of $2.63 and $2.73. Under this contract, TVA obtained 19,250 tons per week with the right to take an additional 19,250 tons per week for the last nine years of the ten year contract. TVA exercised this option in December 1961. Plaintiffs say this option placed a ceiling on the market in the western end of the system. In this regard TVA's Kampmeier observed that "it was very obvious" that West Kentucky "was trying to find somebody to buy the coal at $2.90" and that "any other bidder would know that there wasn't much point in offering coal to TVA at still higher prices as TVA wasn't taking (the West Kentucky) coal." At the next bid opening (September 18, 1962), West Kentucky obtained a contract. It was the highest bidder of the six bidders who received a contract. Its bid, as evaluated, was the equivalent of 12 cents per ton above the next highest. The awards included mine price bids of $2.58, $2.61, $2.67 and $2.73. At the next two bid openings (January 15, 1963 and June 19, 1963), West Kentucky's bid of $2.90 was not successful at Gallatin, by virtue of a bid was next to high at every plant at which it was evaluated. At the October 15, 1963 bid opening, the $2.90 bid was successful at Gallatin, by virtue of a reduced freight rate obtained by TVA.

From the foregoing discussion, the Court finds that West Kentucky's $2.90 bids were in line with existing competitive conditions. No inference of predatory pricing may be drawn therefrom.

*The Section 22 Rail Rate from the Western Kentucky Field to Widows Creek was Obtained In 1960 by TVA in Direct Negotiations. TVA Sought the Rate to Justify Expansion of the Widows Creek Plant*

The so-called Section 22 rate was obtained by TVA from the L&N in August of 1960 from the western Kentucky coal fields to Widows Creek. This rate was an "absolutely essential" factor to a determination to make the second enlargement at Widows Creek.

The Section 22 rate was made on August 29, 1960. The quotation established a rate from western Kentucky of from $1.60 to $1.40 per ton, the exact rate to be determined on a scale based upon total tonnage to Widows Creek from both southern Tennessee and western Kentucky. The sliding scale was negotiated by TVA to include southern Tennessee coal to avoid the possibility of TVA's having to use all western Kentucky coal to obtain thereby a lower transportation rate. The southern Tennessee producers in 1960, in addition to a substantial quality advantage, had rates of 60 and 65 cents, as they had for several years before 1960 and as they have now. Prior to the Section 22 quotation, the L&N rate from western Kentucky to Widows Creek was $2.40, though a $2.07 combined rail and barge rate was available. The $2.07 rate had been used by TVA for evaluation purposes.

It is clear from the record that officials of TVA and L&N negotiated the rate and that West Kentucky and Peabody played no material part in it. Neither did any UMW representative.

Tennessee Products and Tennessee Consolidated joined in a protest of the rate before the Interstate Commerce Commission. TVA and L&N alone defended the rate before the ICC and the rate was upheld.

The significance of the Section 22 rate is pointed out in a letter written by TVA's Chairman Vogel to Senator Kefauver.

' "Adoption of the suggestion that bids of western Kentucky coal producers be evaluated on the basis of the published rates would not, as Mr. Callis suggests, assure that government would obtain the benefit of the Section 22 quotation. It would simply price western Kentucky out of the market and leave TVA dependent solely on the southern Tennessee field for supplying a unit which was put at Widow's Creek only because western Kentucky coal would be available as a source of supply." '

*West Kentucky's Contract with the Louisville Gas and Electric Company and its Operation of the Cherry Hill Mine*

Plaintiffs offered in evidence a contract between Nashville Coal, Inc. and Louisville Gas and Electric Company under which Nashville acquired a quantity of coal from the Cherry Hill mine at approximately $3.55 per ton in 1960 and 1962 for shipment on one of its TVA contracts at $2.85 per ton. Plaintiffs contend that this is evidence of selling below cost and thus evidence which supports their theory of predatory pricing.

The Louisville Gas contract was made by Nashville Coal Company, prior to the 1955 acquisition of West Kentucky, and the contract term extended to March 1, 1963. The agreement contemplated the sale to Louisville Gas of a portion of its requirements of coal, which amounted to a sale of approximately 1,000,000 tons of coal a year. The contract provided for an escalating price which, by the end of the contract term, was $3.55 per ton. The contract had a tie-in provision under which Nashville was responsible for the sale of coal mined at the Cherry Hill mine, a mine owned by Louisville Gas. Nashville was required to pay Louisville Gas $3.70 per ton for the first 200,000 tons and $3.60 per ton thereafter, regardless of where it was sold. This price was paid to Louisville Gas even on Cherry Hill coal shipped from Cherry Hill to Louisville Gas. Most of the Cherry Hill coal was shipped to Louisville Gas and on this coal Nashville received the stipulated price under its contract, and thus realized a "loss" of 10 to 15 cents on each ton. The Cherry Hill coal shipped to Louisville Gas was a part of the approximately 1,000,000 tons a year shipped by Nashville to Louisville Gas. Hence it was necessary for Nashville to absorb that loss out of the profit realized on coal it shipped to Louisville Gas from its own mines.

Some of the Cherry Hill coal for which Nashville paid $3.70 or $3.60 per ton was shipped to purchasers other than Louisville Gas. The record shows that some of this coal was placed at $2.95 to a purchaser other than TVA. In 1960 and 1962 West Kentucky arranged with TVA to place some of the Cherry Hill coal on one of West Kentucky's $2.90 TVA contracts at a price of $2.95 per ton. West Kentucky did not realize a loss on the TVA transaction in that the Cherry Hill coal which went to TVA rather than Louisville Gas was replaced at Louisville Gas by West Kentucky coal at $3.55 per ton which otherwise would have gone to TVA at $2.90. The placement of Cherry Hill coal at a destination other than Louisville Gas permitted West Kentucky to ship more of its coal to Louisville Gas and thereby offset the loss. West Kentucky's Hicks explained, "the dollars and cents were the same thing."

West Kentucky (i. e. Nashville) shipped the Cherry Hill coal to destinations other than Louisville Gas, because Louisville Gas wanted it to. The coal had a limited market and West Kentucky was unable to ship it to TVA in 1961 because TVA didn't want the coal.

Upon the expiration of the Louisville Gas contract in 1963, West Kentucky sought to negotiate a successor contract in either of two ways. West Kentucky offered coal at $3.40 under an agreement which would continue the Cherry Hill arrangement; and it offered coal at $2.90 (the same type coal it was then shipping TVA) without responsibility for the Cherry Hill mine. West Kentucky was

underbid by Peabody Coal Company and lost the account.

*The TVA Contract Awarded to Peabody Coal Company at The Paradise Steam Plant—Other Peabody TVA Contracts*

Peabody Coal Company is said by plaintiffs to have made a "drive" on the TVA beginning in 1959. Peabody is the largest supplier of coal to TVA. Its position as such results largely from its contract with TVA for delivery of some 4,000,000 tons of coal per year to the Paradise Steam Plant.

The Paradise contract was awarded under Requisition 27 with respect to bids opened July 27, 1959. At that time the Paradise plant was not in existence and the description of plant on the award sheets is shown simply as "new steam plant." The award sheets indicate that deliveries were to begin at the rate of 40,000 tons per week in August 1962 and, after April 6, 1963, in an increasing amount to 80,000 tons a week for a total of 65,000,000 tons. The plant price at which the award was made was $2.95.

The invitation which prompted Peabody's bid resulted from a decision on the part of TVA to build one of its steam plants at the coal supply to eliminate transportation costs or to keep them as low as possible. TVA had made studies and had become satisfied that there were plant sites in Western Kentucky where available reserves would make the plan feasible. Thus, in connection with its invitation of July 1957, TVA invited bids in large quantities in the hope that out of this would come an opportunity to build such a plant. The only bid that resulted, which TVA thought was big enough to justify the kind of plant it contemplated, was the Peabody bid, and since it was the low bidder, TVA was in a position to negotiate on modifications to see if a mutually agreeable contract could be arrived at. As a result of these negotiations a price of $2.95 per ton was agreed upon.

The circumstances under which the Paradise contract with TVA was negotiated by Peabody preclude any inference of conspiracy in regard thereto.

*Negotiations between BCOA and UMW Resulting in 1950 Agreement*

The 1950 negotiations were carried on under the surveillance of the National Labor Relations Board and the Court, two injunctions having been issued, one at the instance of the NLRB and the other at the instance of the Department of Justice. The injunction directed the Union and the operators to bargain in good faith.

*Protective Wage Agreement*

Plaintiffs rely strongly on Section A of the Protective Wage Agreement [2] to sup-

---

**2.** A. During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto.

B. It is recognized that when signatory operators mine, prepare, or procure or acquire under subcontract arrangements, bituminous coal mined under terms and conditions less favorable than those provided for in this contract, they deprive employees of employment opportunities, employment conditions and other benefits which these employees are entitled to have safeguarded, stabilized and protected. Accordingly, the Operators agree that all bituminous coal mined, produced, or prepared by them, or any of them, or procured or acquired by them or any of them under a subcontract arrangement, shall be or shall have been mined or produced under terms and conditions which are as favorable to the employees as those provided for in this contract.

"Procured or acquired under a subcontract arrangement" means any contract, lease, license, agreement, arrangement or understanding pursuant to which the

port their contention that the Agreement prescribes labor standards outside the bargaining unit to which it applies.

Counsel for plaintiffs stated that section A was not presented to the District Court or to the Supreme Court in the

signatory operator acquires coal, either as principal or agent, directly or indirectly from a producer other than such signatory for delivery to a person other than such signatory.

The obligation assumed hereunder shall not affect any agreement in effect as of the date of execution of this contract: Provided, however, that any operator signatory hereto who is a party to any agreement inconsistent with the obligations assumed hereunder shall not maintain such inconsistent agreement in effect beyond the first date at which such agreement may be terminated by him in accordance with its terms.

The Operators signatory to this agreement shall so conduct their own operations (whether operated directly or indirectly, or through subsidiaries or affiliates) so as to fully comply with their obligations under this Clause. The obligation of each Operator signatory hereto, which is several and not joint, to fully perform all the conditions in this paragraph B contained, shall be a direct and continuing obligation of said Operator during the life of this Agreement.

As a part of the consideration for this Agreement, the Operators signatory hereto agree that this Clause covers the operation of all the coal lands, coal producing or coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. The said Operators agree that they will not lease, license, or contract out any coal lands, coal producing or coal preparation facilities as a subterfuge for the purpose of avoiding the application of this Clause.

C. There is hereby established a Joint Industry Contract Committee composed of six (6) members, three (3) of whom shall be appointed and may be removed by the Union and three (3) of whom shall be appointed and may be removed by the Opators. Such appointments shall be made and notice thereof given to the proper parties hereto as expeditiously as possible and not later than thirty (30) days after the date of the execution of this Contract. In the event of resignation, removal, death, inability or unwillingness to serve of any of the members of the Committee, the Union shall appoint the successor or successors of the members originally appointed by it and the Opera-

tors shall appoint the successor or successors of the members originally appointed by them. Action which may be required of the Operators for the appointment of any member of the Joint Industry Contract Committee representing them may be taken by those Operators who, at the time, are signatories hereto. Authorization, approval or ratification of Operators representing fifty-one (51) per cent or more of the coal produced for use or sale during the calendar year previous to that in which such action is taken shall be sufficient to bind all Operators.

The Joint Industry Contract Committee may appoint such Joint District Contract Committees in such districts or groups of districts as it may determine, such district committees to consist of such numbers of members, half of whom shall represent the Union and half of whom shall represent the Operators in that district or groups of districts, as the Industry Committee shall deem advisable. The Joint District Contract Committees shall assist the Joint Industry Contract Committee in making any investigations hereunder.

The Joint Industry Contract Committee and the Joint District Committees, when authorized by and under the supervision of the Industry Committee, may employ such clerical and other employees as are required for the performance of their duties hereunder. Expenses of all Committees shall be borne equally by the Union and the Operators.

D. Within one hundred and twenty days after the execution of this contract and each six months thereafter each Operator signatory hereto shall certify in writing to the Joint District Contract Committee for the District where he maintains his principal place of business where such a District Committee exists, or to the Joint Industry Contract Committee where no District Committee exists, that he is in full compliance with all the terms and conditions of this contract or any applicable District Agreement. Within one hundred and twenty days after the execution of this Agreement, and each six months thereafter each Union District President shall certify in writing to his Joint District Contract Committee, if one exists, or, if none exists, to the Joint Industry Contract Committee, a complete list of all Operators and Mines engaged in the production of bituminous coal within his

*Pennington* case either in the Appendix of the briefs or in oral argument.

During the trial one of the attorneys, referred to portions of the record in which the trial court called to the attention of the jury portions of section A.

Plaintiffs argue that UMW agreed in Paragraph A with the signatories to the contract to impose a certain wage scale on other bargaining units and that under the following language in the *Pennington* opinion it thereby forfeited its exemption from the antitrust laws:

"But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has

agreed with one set of employers to impose a certain wage scale on other bargaining units."

The Supreme Court then observed that there is nothing in labor policy indicating that the Union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units or to attempt to settle these matters for the entire industry. The obligation of the Union to its members would seem best served if the Union retains the ability to respond to each bargaining situation as circumstances might warrant, "without being strait-jacketed by some prior agreement with the favored employees."

district whose operations are under contract with the Union. No operator may be found to be in violation of this Protective Wage Clause with respect to any coal produced by another operator who is listed on the Contract list to be furnished by United Mine Workers of America under this paragraph, unless and until such operator is notified in writing by the Joint Industry Contract Committee that such operator has failed to comply with the provisions of this Clause and such failure has not been corrected.

E. Any party signatory to this contract shall have the right at any time to file a complaint with the Joint Industry Contract Committee alleging a violation of any provision of this Protective Wage Clause. In the event such a charge is filed it shall be the duty of the Joint Industry Contract Committee to investigate and determine the facts with respect to such alleged violation. Any determination by the Joint Industry Committee that a violation of this Clause has occurred may be made only upon the concurrence therein of a majority of the membership of the Committee. Notice by the Committee to the affected party, opportunity for the party to be heard, and failure promptly to effect full compliance after a finding of violation by the Committee shall be deemed a condition precedent to any final determination that a violation of this Clause has occurred. Findings made by the Joint Committee, after notice and opportunity for hearing, shall be served upon all parties to the proceeding, and shall constitute a final determination as to the fact of a violation. Failure or refusal of United Mine Workers or any Operator signatory hereto to comply with

a final determination by the Committee of a violation of Paragraphs (A) or (B) of this Clause may be deemed a violation of this Agreement.

The Mine Workers agree to make available to the Joint Industry Contract Committee all contracts, agreements, or understandings entered into by the Mine Workers with any person engaged in the production of bituminous coal, and further agree to appear before the Committee on request by it and inform the Committee on such other related and pertinent matters as shall be essential to the Committee's investigation of an alleged violation of this Protective Wage Clause. Each Operator signatory hereto agrees to appear before the Committee on request by it and inform the Committee as to the source and quantity of coal produced or purchased or otherwise acquired, payment of wages to, and hours and working conditions of classified employees, payments to the United Mine Workers of America Welfare and Retirement Fund, and such other related and pertinent matters as shall be essential to the Committee's Investigation of an alleged violation of this Protective Wage Clause.

The authority of the Committee is restricted to the subject matter covered in this Protective Wage Clause and shall not extend to disputes concerning the administration of the Contract which are of the type that have heretofore been processed under the grievance procedures provided for in the Section of the Contract entitled "Settlement of Local and District Disputes"; nor shall the provisions of this "Protective Wage Clause" be subject to the terms or conditions of the "Settlement of Local and District Disputes" section of this Contract.

Counsel for plaintiffs in their pre-trial brief stated that "predatory intent is almost an inevitable element of proof in developing a case of conspiracy based on circumstantial evidence." But counsel asserted that direct evidence of such an agreement was a violation of the anti-trust act per se, and that when Paragraph A was inserted in the Protective Wage Clause in December, 1928, the agreements and understandings between UMW and BCOA constituted per se violations of the Sherman Act throughout the critical period of the case.

We do not agree.

Paragraph B of the Protective Wage Clause manifests an intention to protect the continuity of work of the employees against the practice of the employers procuring from others by land-lease, sub-contract or otherwise coal that was produced under terms and conditions less favorable than those provided in the contract with the Union.

Paragraph A obligates the UMW not to enter into or be a party to any agreement covering wages and working conditions applicable to employers covered by the contract on any basis other than those specified in the contract. "The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain *full compliance therewith by each and all parties signatory thereto.*" (Emphasis added.)

It is to be observed that the UMW only obligates itself for full compliance of the terms of the contract by the "parties signatory thereto." Paragraph A does not appear to obligate UMW to embody the same terms and conditions in contracts to be made with other parties not signatory to the 1950 contract and the amendments thereto. The language in Paragraph A may not be as clear as it might be. But it does not appear to bind the Union to the same standards and conditions in dealing with other bargaining units.

Mr. Welly K. Hopkins, Senior Counsel for UMW and at one time a member of the Criminal Division of the Department of Justice, who participated in the bargaining negotiations from 1943 through 1964 and presumably assisted in the drafting of the 1958 amendment, stated that the operators demanded Paragraph A and the Union demanded Paragraph B and that neither paragraphs affected anyone except those signatory to the contract. This testimony would only be competent if the contract is ambiguous. We understand that it is the position of both parties that the contract is not ambiguous.

The land lease provision of the Protective Wage Clause sprang from the 1941 amendment and first appeared in the 1943 agreement. Mr. Hopkins stated it had no connection with what is referred to as a "favorite nation" clause. It grew out of the practice by signatory operators of avoiding obligations under their contracts by leasing their coal lands to other operators who were non-signatories as a subterfuge to avoid the terms of the contract. This clause was eliminated in the 1964 contract on account of the "hot cargo" provision provided for in the Landrum-Griffith act.

■ If a contract is subject to two reasonable constructions, the one should be given that does not result in a violation of law. Great Northern Ry. Co. v. Delmar Co., 283 U.S. 686, 691, 51 S.Ct. 579, 75 L.Ed. 1349; Perry Coal Company v. NLRB, 284 F.2d 910, 914 (C.A.7).

The trial court charged the jury in the first *Pennington* trial that "Where two reasonable constructions of a written contract can be made, preference is given to that construction of such contract that does not result in a violation of law. The Court will not construe a contract to violate the law if it can by reasonable construction construe it to come within the purview of the law." Printed Record, Vol. III, p. 1587a; Williston on Contracts, 3rd Ed. (Jaeger), Vol. 4, pp. 747–748; Restatement on Contracts, Sec. 236.

*Allegations of Predatory Pricing were denied By all Parties who Testified and Who Participated In the 1950 Basic Agreement and the Various Amendments to such Agreement*

Ten witnesses, each of whom was in a position to know, testified positively that there was no predatory price fixing. Included in this list were UMW officials who likewise denied any participation in any alleged price fixing.

■ A conspiracy need not be proved by formal agreement or by direct evidence. It is rare that a conspiracy is proved by direct evidence. American Tobacco Company v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575; Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610.

Unity of purpose or a common design is sufficient. Kiefer-Stewart Company v. Joseph E. Seagram & Sons, 340 U.S. 211, 213–214, 71 S.Ct. 259, 95 L.Ed. 219.

■ If the necessary result of a combination or agreement unreasonably restrains trade, it violates the Sherman Act. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 244, 20 S.Ct. 96, 44 L.Ed. 136; United States v. Reading Co., 226 U.S. 324, 33 S.Ct. 90, 57 L. Ed. 243; United States v. Live Poultry Dealers' Protective Association, Inc., 4 F.2d 840, 843 (C.C.A.2); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416, 423 (C.A.10).

■ However, the proof is insufficient to establish plaintiffs' claim that West Kentucky Coal Company or any other coal operator bid on TVA coal for the purpose of depressing the price of coal on the TVA coal market and thereby drive small coal operators, including plaintiffs, out of business; or that West Kentucky Coal Company or any other operator through arrangement, combination or otherwise fixed the price or attempted to fix the price of coal on the TVA market.

The proof is insufficient to show that UMW, by arrangement, combination or otherwise, influenced or attempted to influence West Kentucky Coal Company or any other coal operator in bidding for coal on the TVA market.

The Court finds that the contracts obtained from TVA by various coal companies charged with the conspiracy were obtained as a result of lawful efforts and that they did not submit low bids to the TVA for the predatory purpose of putting small coal operators, including plaintiffs, out of business but were made in a competitive market. If the price of coal purchased by TVA f. o. b. mines was lower than the national average, it was due to the policy of TVA to keep the price down, which in part, it seems to the Court, was effected by long term contracts for enormous tonnages of coal.

Plaintiffs claim that Messrs. Lewis and Love stated in speeches and press conferences, some of which were carried in the UMW Journal, that one of the objectives of the 1950 Agreement was to stabilize the coal industry.

Mr. Love, in his testimony, stated that his use of the word "stabilization" meant stabilization of working conditions. Mr. Lewis stated that the question of price was a prerogative of management with which the UMW was not concerned. Plaintiffs argue that the respective positions of UMW and the coal operators materially changed in 1950 from their positions of the past when the UMW had sought a three-day work week in order to equitably apportion the work among the miners. Mr. Lewis and the other witnesses in the negotiations explained that the three-day work week was not an issue in the 1950 negotiations but was simply used as a bargaining tactic; that the miners were out of work in late 1949 and early 1950 and the public was being made to believe that coal supplies would soon become exhausted. UMW caused the workers to work three days a week to disabuse the minds of the public of this thought and at the same time enable the miners to earn enough money for their families to live on.

Plaintiffs say that the wages, including the royalty provided for in the 1950 Agreement and the amendments thereto

were geared to the operations of the large mechanized coal operators for the purpose of putting the small coal operators out of business because the BCOA and UMW knew that the small marginal operators could not pay the wages provided in the Agreement.

This charge is also denied by all of those who participated in the negotiations and who testified in the case.

The Court is of the opinion and finds that plaintiffs have failed to prove, either by a preponderance of the evidence or by the standards of evidence established by the Supreme Court in UMW v. Gibbs, supra, that the defendant engaged in a combination or conspiracy so as to unreasonably restrain trade or to monopolize commerce among the several states as alleged in the complaint. In this connection, the Court observes that the extensive evidence introduced by plaintiffs of violence in the coal fields is consistent with the Union's determination to unionize the units of the entire area, and, in the light of the Court's conclusion just noted, is insufficient to show a Sherman Act antitrust violation.

COMMON LAW CLAIMS OF PARTON COAL COMPANY AND DEAN COAL COMPANY

This brings us to the alternative claims of Parton Coal Company and Dean Coal Company which are based upon alleged violations by the Union of Tennessee law. This part of the claim is based on evidence of violence and intimidation by the Union.

The principle that permits damages based on state law was reaffirmed in the recent case of United Mine Workers of America v. Gibbs, supra, 383 U.S. 715, 721, 86 S.Ct. p. 1136, as follows:

" 'We have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. International Union, United Automobile, etc., Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030; United Construction Workers, etc., v. Laburnum Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025. * * * State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction.' San Diego Building Trades Council, etc. v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 781, 3 L.Ed.2d 775.

" * * * The Court held in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, that state law claims are appropriate for federal court determination if they form a separate but parallel ground for relief also sought in a substantial claim based on federal law."

The federal claim must have had sufficient substance to confer jurisdiction on the Federal Court before it can try the state claim. In addition state and federal claims must derive "from a common nucleus of operative fact." And pendent jurisdiction is a matter of sound judicial discretion and not a right of plaintiffs. United Mine Workers of America v. Gibbs, supra.

The interest of the attorneys in the antitrust phase of the lawsuit overshadowed the alternative claims based on Tennessee law. This is shown in both the oral and written arguments of counsel.

■ In the opinion of the Court, plaintiffs in the present cases stated, in good faith, substantial claims based on federal law. Although the Court has held that the federal claims were not established, this does not deprive the court of jurisdiction to determine the non-federal ground. The trend under the Federal Rules is to require plaintiffs to try their causes of action at the same time. This principle was stated by the Supreme Court long before the Federal Rules came into existence. Baltimore S. S. Co. v. Phillips, 274 U.S. 316, 319, 47 S.Ct. 600, 71 L.Ed. 1069.

Dean Coal Company and W. R. Parton charge that in pursuance of unlaw-

ful activities and with the intent and purpose to unlawfully and illegally interrupt, impede, terminate and destroy the business of the plaintiffs, that the defendant through its duly constituted and authorized officers, agents, representatives and members caused huge motorcades to be assembled and formed to roam and block the highways and roads in and around the area of plaintiffs' operations; that they threatened abuse and intimidated employees of the plaintiffs with the result that plaintiffs' employees and others were alarmed, frightened and intimidated to such an extent that the mining operations of plaintiffs were completely halted for a time and drastically curtailed for a longer period and plaintiff Dean Coal Company was compelled to spend large sums of money to safeguard its equipment and to move its operations to a safer location; that defendant's agents and members, at the direction of its duly authorized officers and representatives, placed dynamite upon the coal mining machinery of the plaintiffs in an effort to destroy it and although the explosion did not occur, plaintiffs' employees and others were further intimidated and frightened thereby to the damage of plaintiffs' businesses; that the interruption of the Dean Coal Company's business began on or about March 16, 1959 and it was not until 1961 that it was able to resume normal and profitable operations of its business and that the wrongful and unlawful activities of the defendant were prompted and carried out with a wanton, deliberate and malicious intent and purpose to destroy the business and property of plaintiffs in consequence of which the plaintiffs are entitled to recover punitive damages.

### W. R. Parton

The common law or state law claim of W. R. Parton, d/b/a Parton Coal Company, arises out of the termination in 1959 of his strip coal mining operations near Beech Fork in the New River Section of southwestern Campbell County, Tennessee. Parton had been engaged in strip mining since 1953 on various leaseholds in Morgan and Campbell Counties.

In 1959 he moved his operations from the Beech Fork location to a higher seam of coal and had completed the building of his haul roads. He had for a number of years sold most of his coal to the TVA for delivery to the Kingston Steam Plant, and in January, 1959 his sales agent obtained a term contract to be filled by him and another producer which called for 1,200 to 1,300 tons per week for twelve months. The coal was shipped by rail from a loading facility on the Tennessee Railroad located a short distance along a public road from the entrance to Parton's leasehold which was several miles from his mine. The coal was hauled by truck from the mine to the railroad siding mainly by trucks owned by a trucking contractor, Allen, who furnished the trucks and drivers and who was paid by the ton.

There is much evidence in the record about the refusal of strip mining operators in eastern Tennessee to sign the National Bituminous Coal Wage Agreement, as amended in 1958, the cancellation of most of the existing contracts by UMW and the intensive efforts of the Union to see that no coal was hauled or produced by such operators. Parton was not served with a termination notice because according to Field Representative Ross, it was believed that Parton had discontinued operations. The Trustees of the Welfare Fund had filed their action against him for unpaid royalties on June 13, 1958. The circumstances under which Parton originally signed the Wage Agreement will be hereinafter noticed.

On or about March 30, UMW field representatives, Ross and perhaps Jones, participated in a motorcade or caravan of cars occupied by UMW members through the New River area. For about a week thereafter a similar group gathered at a point on the Petros Mountain highway. Their purpose is disputed, but it is obvious that it had something to do with preventing the hauling of coal from the mining operation to Kingston.

On April 15, 1959, Parton undertook to have his coal trucked from his strip pit to the railroad but Allen's trucks

were stopped near the intersection of the haul road and the public road by a large group of UMW members. A few were armed. Parton was warned that he should not be loading coal if he had not signed the UMW contract. And after some discussion the coal in the trucks was dumped by the side of the public road. Parton did not try to load any more coal until the following August. He and his employees and the truckers were afraid to.

The threats made against Parton and the dumping of the coal without a shot being fired or a blow being struck might as one isolated incident be considered non-violent, but taking place in the atmosphere of threats and violence shown by the proof in this case and in others, particularly Allen v. UMW, 319 F.2d 594, (C.A.6), it is not to be characterized as UMW contends, as peaceful picketing. It was the type of activity enjoined by orders of the United States District Court for the Eastern District of Kentucky entered April 30 and May 4, 1959 on petition of the Regional Director of the National Labor Relations Board including "assaulting, stoning, clubbing, overturning or threatening to overturn equipment, threatening physical violence or other injury."

The group of so-called pickets that had stopped the hauling of Parton's coal came mainly from the membership of two nearby UMW local unions, three of whose members testified that it was their purpose to stop Parton's operation. One of them testified for the Union that they just happened along at the time for no particular purpose. Some of them had obtained gasoline paid for by UMW Field Representative Ross under an arrangement whereby it was to be used by the members for "picket line" work. Such activity, as the stopping of Parton's operation, was in accordance with and a part of UMW's purpose of stopping the production of non-union coal.

In May 1959 there were several instances of shooting into coal hauling trucks and into the cars of employees of at least one non-union operation. Strip mining equipment belonging to this same operator, Double Camp Mining Company, was destroyed by dynamite late in May on a Sunday, the day before dynamite was found on the mining equipment of Dean Coal Company operated by the brother of the principal in Double Camp Mining Company.

Parton undertook to resume his operations after an election conducted by the NLRB in which UMW was defeated, but he was not able to make up for the time lost during the spring and summer. He could not get a crew to work at night or enough truckers to haul the coal.

Parton could not keep the payments up on his equipment or produce enough coal to keep his markets with the result that he lost his business entirely. There was no market for the equipment in 1959 because of the inactivity among the coal strippers and because the insurance necessary to a purchase money loan was not to be had. The insurance carried by the operators in the area was cancelled after the destruction of the Gilchrist tipples at Jellico and the Double Camp Mining equipment in the New River area during the month of May.

Parton, at the time his coal stripping business stopped, owed various sums of money for the purchase price of most of the items of his equipment, a stripping shovel, a loading shovel, a bulldozer, a grader, the loading ramp or crusher, and other small pieces. In his item by item calculations he claimed a market value for the equipment in excess of the debt against it of $73,800.00. Parton's business was relatively small and his accounting records were meager. According to his income tax returns his record of profits (or loss) was as follows:

| 1954 | $19,865.90 |
| 1955 | 12,088.14 |
| 1956 | 25,409.03 |
| 1957 | 1,633.41 |
| 1958 | 9,414.22 Loss |

His loss in 1958 was explained by him as due to the cost of building new haul roads and of doing other road work in that year. The suit brought against him

by the Trustees of the UMW of America Welfare Fund would also tend to cause the postponing of production of coal as distinguished from preparation work.

Parton's testimony is that he was persuaded in 1954 to sign the printed form modifying and supplementing the National Bituminous Coal Wage Agreement of 1950 by UMW Field Representative Les Jones, after several visits by Jones to his mine and home and under a threat by Jones that if he did not sign the "Jones boys" would "come around" and after advising Jones that he was signing it because he "did not want to get anybody hurt and get my equipment tore up." He was never given a copy of the basic contract containing the wage scale and other information. He paid his employees whatever was agreeable and later the Walsh-Healey prevailing wage scale. None of Parton's employees were at any time members of the UMW; no employee was given a so-called hospital card or received benefits from the UMW of America Welfare and Retirement Fund. Parton testified he had no contract with any UMW representative except with Jones who at irregular intervals requested Parton to make a token payment to the Welfare Fund. Parton sent in no tonnage reports to the Fund. He testified that Jones told him he could pay what royalty he could, "that's the way most of them do."

This testimony is not contradicted by any witness in position to know any of the facts. It is corroborated by the testimony of other plaintiffs in this case that they were persuaded by threats to sign the papers and were advised by one or the other of the UMW field representatives that they pay what they could to the Welfare Fund.

### Dean Coal Company

Dean Coal Company was organized in 1954 as a coal stripping and augering business in the vicinity of Straight Fork in Scott and Campbell Counties, Tennessee. Ralph Ross and Paul Ross were the owners and were jointly in charge of the operations of the company until the for-

mation of a second operating division in May, 1956. From that time until the end of 1958, Ralph Ross operated the division known as Dean or Dean No. 2, which operated in the vicinity of Straight Fork. Paul Ross operated the division known as Fork Mountain, or Dean No. 3 in the vicinity of Fork Mountain, Tennessee. At the end of 1958 the Dean operation, or Dean No. 2 continued as the operating unit of the corporation and the Fork Mountain, or Dean No. 3 division was separately incorporated as Double Camp Mining Company. From that time, Ralph Ross has been in charge of the operations of the Dean Coal Company and acquired the stock interest in Dean Coal Company previously held by Paul Ross.

The Company evaded the efforts of UMW organizers to obtain an authorized execution by Dean Coal Company of the National Bituminous Coal Wage Agreement. However, Paul Ross signed one of the supplements in 1954 as "lessee" covering the operation listed on the contract as Dean Coal Company at Dean, Tennessee, and he signed another one of the supplements in 1956 as "partner" covering the Dean Coal Company at Fork Mountain, Tennessee. In the meantime, and up until 1959, Ralph Ross was visited several times by UMW Field Representatives Daniel and Maddux, who tried but failed to persuade him to sign the Agreement on behalf of Dean Coal Company and pay only what he could to the Welfare Fund. The corporation did not recognize this Agreement and did not check off dues or make payments to the Welfare Fund. It was threatened with litigation over the Welfare Fund royalties, after which it maintained a reserve on its account in anticipation of potential liability. However, the Trustees never sued Dean Coal Company.

Most of the coal of Dean Coal Company was sold to TVA on term and spot contracts. The financial records of the two operating divisions were separately maintained during the period of concurrent operations so that the profit-making ability of the division operated by Ralph Ross can be separately calculated. It is now

the only operation of Dean Coal Company and has been since 1959. The annual profits and losses of Dean Coal Company (or division) as reported for federal income taxation was as follows:

| 1955 | $32,407.22 | |
| 1956 | 31,710.20 | |
| 1957 | 17,226.84 | |
| 1958 | 2,469.32 | Loss |
| 1959 | 37,531.47 | Loss |
| 1960 | 13,249.94 | Loss |
| 1961 | 1,233.39 | |
| 1962 | 13,441.38 | |

The 1958 loss is explained by Ross as having been caused in part by a heart attack which disabled him in early October, low sales prices and unusually high equipment repair costs.

On March 16, 1959, a UMW motorcade of approximately 100 cars, led by Field Representatives Prater and Daniel, came to the hollow where the Dean tipple and loading facilities were located and told the foreman and a truck driver that they where shutting the mine down and not to bring any more coal down from the strip pit. Prater and Daniel told them that they had shut down the mine of U. R. Arnold, which they had visited that morning with the same motorcade, and the operations of Gilchrist, Randolph and Snyder and that "they were going to stop the rest of them." The foreman sent for the stripping crew as ordered by the UMW representatives, and Prater and Daniel made speeches to the assembled employees. Some of them joined the Union the next day and started drawing weekly grocery allowances from the Union.

The operations of the company were discontinued until April 30, 1959 when Ross sent word to the men that he would undertake to resume work the following week. This was the date that the restraining order was issued by the United States District Court for the Eastern District of Kentucky, mentioned above in connection with the Parton claim. On Monday, June 1, 1959, when the mining crew went to work they found twenty-six sticks of dynamite on the auger "that had not gone off." Later that month the railroad trestle leading to the Dean tipple was burned and the following evening the automobile occupied by some of the employees leaving work was struck by rifle fire. Only about one-half of the former Dean employees came back to work during the 1959 working season. Although a rival union prevailed in an election held later in 1959, it was not until 1961 that the company was able to recover from the interruptions, disorganization and other trouble and to assemble a full crew of employees.

About two years later, in 1961, two of the Dean employees who had joined the Union in 1959 confessed that they had placed the dynamite on the auger at the direction of Field Representative Prater and UMW Local President, George Cross, on Sunday, May 31, the same afternoon that the equipment of Double Camp Mining Company, owned by Paul Ross, was destroyed by dynamite explosions some fifteen or twenty miles away.

*Damages*

■■ UMW is liable for damages to the plaintiffs, Dean Coal Company and Parton Coal Company, resulting directly and proximately from its wrongful acts hereinbefore set out. These plaintiffs were entitled to operate their businesses without tortious interferences by the defendant. Hutton v. Waters, 4 Higgins 582, 583, 589 (1914 Tenn.Ct. of Civil Appeals); Lann v. Third National Bank in Nashville, 198 Tenn. 70, 277 S.W.2d 439; Love and Amos Coal Co. v. UMW, 53 Tenn.App. 37, 378 S.W.2d 430, 437; UMW v. Meadow Creek Coal Co., 263 F.2d 52, 63 (C.A.6). Twenty-three witnesses, persons in a position to know, testified of the violence and extreme fear created by such violence that was caused by the organizational activities of UMW. Defendant breached a duty owed to them under the Tennessee common law when it wrongfully and unlawfully, through violence and fear, interfered with their op-

erations. See White Oak Coal Company v. UMW, 318 F.2d 591, 600–601 (C.A.6).

It is a violation of Tennessee law to interfere maliciously or intentionally with the business and contractual relations of another, except under certain circumstances and for certain purposes. It is not a violation of state law for a union intentionally to cause harm to an employer in interrupting its business and contractual relations by peaceably inducing its employees to go on strike for the purpose of obtaining better wages and working conditions.

It is the acts of violence that result in damages to the plaintiffs' property or business which are the basis of a state law claim. International Union, etc. v. Wisconsin Employment Relations Board, 336 U.S. 245, 253, 69 S.Ct. 516, 93 L.Ed. 651.

A union has the right under state law to induce employees by fair persuasion to withhold their services from an employer in order to obtain a collective bargaining agreement. Restatement of Torts, Vol. 4, Sec. 798.

By fair persuasion is meant argument, exhortation or entreaty addressed to a person without threat of physical harm. Restatement of Torts, Vol. 4, Sec. 779.

A union has the right under state and federal law to induce employees to leave their work and to remain away from their work by paying or by giving such employees strike benefits or other moneys or things of value. Restatement of Torts, Sec. 798, Comment a, Sec. 20 Clayton Act, 29 U.S.C. § 52, Sec. 4 Norris-LaGuardia Act, 29 U.S.C. § 104.

■ These suits are against a Union which is an association of individuals and is not against any individual person. Necessarily, any acts performed by the Union were done by its individual officers, agents or members. The defendant Union would not be liable for any act merely because it was done by a member of the Union, for union membership alone does not constitute the member an agent of the Union. United Brotherhood of Carpenters, etc. v. United States, 330 U.S. 395, 406–407, 67 S.Ct. 775, 91 L.Ed. 973.

■ The mere fact that a member of the defendant Union is an officer in a Local Union affiliated with the defendant Union does not, in itself, constitute such Local Union officer an agent of the defendant Union and in the absence of evidence establishing such agency, the defendant Union is not responsible for any acts performed by such Local Union officer. Garmeada Coal Co. v. International Union, UMW, 230 F.2d 945 (C.A. 6).

It is admitted by the defendant that William Prater, Ed Daniel and Ed Ross were, during the period involved in these cases, employed as Field Representatives of District 19 of the defendant Union and as such were agents of the defendant Union. Under these circumstances the Court is of the opinion that defendant Union is responsible for acts performed and instigated by these agents in the course of their employment.

■ The custom or traditional practice of the Union can be the source of actual authorization of an agent to act for and bind the Union. United Brotherhood of Carpenters, Inc. v. United States, supra, 330 U.S. 410, 67 S.Ct. 775.

If the Union was guilty of causing harm to plaintiffs' businesses, under circumstances whereby either the object or the means was illegal, the defendant would be liable for the entire resulting damages. See Carpenters Union, Local 131 v. Cisco Const. Co., 9 Cir., 266 F.2d 365; United Mine Workers of America v. Osborne Mining Co., 6 Cir., 279 F.2d 716.

The interruption and other losses sustained by Dean Coal Company and Parton Coal Company were caused by violent conduct carried on by UMW members and instigated by officials Prater, Daniel and to a lesser extent, Ross. Among the state laws violated were Code Section 39–2805 prohibiting the willful

traveling, riding or walking through the country or towns, to the disturbance of the peace or to the alarm of the citizens for the purposes of, among other things, terrorizing any citizen or causing through threats or intimidation or other improper means any citizen not to do any lawful thing and Section 39–2303 prohibiting persons from obstructing a public or private road.

It is established by the evidence that Dean Coal Company, as operated over a period of more than ten years by Ralph Ross in substantially the same location and conditions, was and is capable of making during normal years substantial profits.

 Parton Coal Company, of which W. R. Parton is the owner, suffered damages due to the unlawful and wrongful acts of the defendant. Damages from loss of his equipment amounted to $65,000.00. The business was making a profit, or capable of making a profit of at least $15,000.00 a year over a period of several years. He sustained losses of profits for the years 1959, 1960 and 1961 on the basis of $15,000.00 a year, or a total of $45,000.00 in lost profits.

The Court, therefore, fixes the compensatory damages at $45,000.00, plus $65,000.00, or a total of $110,000.00.

Parton is entitled to punitive damages on account of the oppressive, wanton and unlawful acts of the defendant, in the amount of $50,000.00. The Court fixes the total amount of damages of the Parton Coal Company at $160,000.00.

Dean Coal Company suffered an operating loss in 1959 on account of the wrongful and unlawful acts of the defendant of $37,537.47 and an operating loss in 1960 of $13,249.94, or a total operating loss of $50,787.41. Dean made a profit in the year 1955 of $32,000.00, in 1956 of $31,000.00 and in 1957 of at least $17,000.00. There is proof supporting a total loss of profits for 1958–60 of $17,000.00 a year, or a total of $51,000.00. Dean, therefore, suffered compensatory damages in the amount of $101,787.41.

In addition, Dean Coal Company is entitled to punitive damages on account of the oppressive, wrongful and unlawful acts of the defendant in the amount of $50,000.00, making a grand total of $151,787.41.

The costs of the consolidated cases are taxed against the defendant.